## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

### CASE NO.  24-cv-2971

### JURY

| | |
|---|---|
| _____ )<br><br>SECURITIES AND EXCHANGE COMMISSION,  )<br>                                        )<br>Plaintiff,                              )<br>                                        )<br>v.                                      )<br>                                        )<br>KEVAN CASEY, JONATHAN FRIEDLANDER,      )<br>ADRIAN JAMES, and ROBERT WHEAT,         )<br>                                        )<br>Defendants,                             )<br>                                        )<br>VERTICAL HOLDINGS, LLC, DOVER HILL,     )<br>LLC, GSK STRATEGIES, LLC, CARMEL        )<br>VENTURES, LLC, ALS INVESTMENTS, LLC,    )<br>HIGHBRIDGE CONSULTANTS, LLC, ADRIAN     )<br>JAMES AS THE TRUSTEE OF THE ASJ         )<br>LIVING TRUST, ESPORTS GROUP, INC.,      )<br>OAK GROVE ASSET MANAGEMENT, INC.,       )<br>and YSW HOLDINGS, INC.,                 )<br>                                        )<br>Relief Defendants.                      )<br>_____ ) | **JURY TRIAL DEMANDED** |

### COMPLAINT

Plaintiff Securities and Exchange Commission (the "SEC" or "Commission") alleges the

following against Defendants Kevan Casey ("Casey"), Jonathan Friedlander ("Friedlander"),

Adrian James ("James") and Robert Wheat ("Wheat") (collectively, "Defendants"), and Relief

Defendants Vertical Holdings, LLC ("Vertical Holdings"), Dover Hill, LLC ("Dover Hill"),

GSK Strategies, LLC ("GSK"), Carmel Ventures, LLC ("Carmel Ventures"), ALS Investments,

LLC ("ALS Investments"), Highbridge Consultants, LLC ("Highbridge Consultants"), Adrian

James as the Trustee of the ASJ Living Trust ("ASJ Living Trust"), Esports Group, Inc.

("Esports Group"), Oak Grove Asset Management, Inc. ("Oak Grove"), and YSW Holdings, Inc. ("YSW Holdings") (collectively, "Relief Defendants"):

## INTRODUCTION

1. The Commission brings this action with respect to a multi-year securities fraud scheme orchestrated by Kevan Casey.   The scheme involved Casey, either alone or with combinations of his co-schemers acquiring a large quantity of shares in a series of "microcap" companies at steep discounts, taking the companies public and/or direct marketing and stock promotions recommending that the investing public purchase the stocks, and then selling substantial amount of stock for enormous profits without disclosing his or his confederates' ownership stakes, paid stock promotions, or material relationships with the companies.  These companies were CNS Pharmaceuticals, Inc. ("CNS"), Soliton, Inc. ("Soliton"), Esports Technologies Inc. n/k/a/ EBET, Inc. ("EBET"), Volcon, Inc. ("Volcon") and Sidus Space, Inc. ("Sidus Space").  Casey and his co-defendants profited by at least $56 million from their conduct, defrauding and harming investors who were deprived of disclosures required by law to ensure fair and open access to material information about the companies, their promoters, and the persons involved in these companies' registered securities offerings.

2. Casey sometimes worked alone, and other times agreed with long-time friends and business associates, co-defendants Adrian James and Jonathan Friedlander, to acquire, hold, and dispose of the stock of these companies with the common objective of selling shares in the open market at inflated values – all while out of the public eye.  As to one of the companies, Casey, Friedlander, and their business associate co-defendant Robert Wheat concealed themselves at the time of initiating the public sale of the company's stock (commonly known as "taking the company public").  All three of them sold substantial numbers of shares in the first days of public trading (collectively over $13 million worth), when the stock spiked by 800% amid stock promotions Casey and Friedlander arranged.

3.      Defendants had roles in these microcap companies that required them to be identified by name in SEC filings as public company promoters, selling shareholders, and/or beneficial owners of more than 5% of the registered class of stock of the public company ("5%+ beneficial owners").  Further, by having those roles, the law required certain additional information concerning transactions or relationships they had with the companies to be disclosed.  Casey, James, Friedlander and Wheat schemed to evade these disclosure requirements by structuring their stock acquisitions through pass-through nominee entities (nominally controlled by friends or family members), and using these nominee entities for the submission of false information to the companies required to disclose such information in SEC filings.  Casey, Friedlander, and James also failed to file their own required beneficial ownership reports with the SEC.

4.      The purpose for evasion was to avoid disclosing the Defendants' identities as significant shareholders of, and their material relationships to, these companies.  Casey, Friedlander, and Wheat had all been named defendants in a series of recent private litigation in federal and state courts about another microcap stock, LuxeYard Inc. (the "LuxeYard Litigation").  The scheme continued through at least December 2022 notwithstanding a published appellate decision in 2019, in the middle of the scheme, containing detailed findings that Casey – with the explicit use of Friedlander and others – took a microcap company, like the companies at issue here, public and manipulated its stock to the loss of LuxeYard and its public investors.

5.      The disclosure requirements of the federal securities laws are meant to ensure the investing public is aware of the involvement of certain individuals in public companies.  The availability of these disclosures allows investors to evaluate the risks in deciding whether to make investments.  These required disclosures are particularly important in high-risk areas such as new microcap company offerings.  Defendants hid this information on the series of microcap

companies here.  By remaining undisclosed, public trading commenced and continued without the investing public knowing Defendants' substantial involvement, their material relationships to the companies, or the substance of material transactions they had entered into prior to the companies' securities offerings.

6.      The false and misleading statements and omissions alleged in this Complaint were material because a reasonable investor would have wanted to know the truth behind the misstatements and omissions.  Of particular interest to investors would have been the fact that Defendants – whether individually or, in the case of Friedlander and James with Casey, as a "group" – were public company promoters, selling shareholders, and/or 5%+beneficial owners (and, in those capacities, had entered into certain transactions with the company) of a risky microcap company like LuxeYard.

7.      As part of the scheme, Casey, James, and Friedlander also hired stock promoters to publicly recommend the purchase of stock while intending to sell their own stock.  For example, Casey and James hired – and personally compensated – a stock promoter in 2019 to promote Soliton as they were registering shares for resale and other shares were becoming available for public trading.  Casey and James sold substantial amounts of shares during and in the wake of the stock promotions.  Casey and Friedlander then worked with the same stock promoter (and others) to promote EBET stock at the time of its initial public offering ("IPO") of stock – when Casey and Friedlander sold approximately $11 million worth of EBET stock in the open market.

8.      As alleged in detail below, Defendants committed the following violations:

        a.  Casey violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933

            (the "Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)] and Sections

            10(b), 13(d), and 16(a) of the Securities Exchange Act of 1934

            ("Exchange Act") [15 U.S.C. §§ 78j(b), 78m(d), 78p(a)] and Rules 10b-5,

13d-1, and 16a-3 thereunder [17 C.F.R. §§ 240.10b-5, 240.13d-1 and 240.16a-3].  Casey is also liable for violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder through or by means of another person in violation of Section 20(b) of the Exchange Act [15 U.S.C. § 78t(b)].

b. Friedlander violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Sections 10(b), 13(d), and 16(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(d), 78p(a)] and Rules 10b-5, 13d-1, and 16a-3 thereunder [17 C.F.R. §§ 240.10b-5, 240.13d-1 and 240.16a-3].  Friedlander is also liable for violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder through or by means of another person in violation of Section 20(b) of the Exchange Act [15 U.S.C. § 78t(b)].

c. James violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Sections 10(b) and 13(d) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(d)] and Rules 10b-5(a), 10b-5(c) and 13d-1 thereunder [17 C.F.R. §§ 240.10b-5(a), 240.10b-5(c), 240.13d-1].

d. Wheat violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) thereunder [17 C.F.R. §§ 240.10b-5(a), 240.10b-5(c)].  Wheat is also liable for violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder through or by means of another person in violation of Section 20(b) of the Exchange Act [15 U.S.C. § 78t(b)].

9. The Commission seeks injunctive relief against Defendants, disgorgement of ill-gotten gains and prejudgment interest thereon, civil money penalties, an order preventing Defendants from engaging in transactions in penny stocks, and an order preventing them from

acting as an officer or director of an issuer of a class of securities registered with the Commission.

10.     Relief Defendants Vertical Holdings, Dover Hill, GSK, Carmel Ventures, ALS Investments, Highbridge Consultants, ASJ Living Trust, Esports Group, Oak Grove, and YSW Holdings were nominee entities through which Casey, Friedlander, James, and/or Wheat received and sold shares in the course of the Defendants' scheme.  The Relief Defendants received proceeds from the Defendants' sale of stock during the period of their fraudulent conduct and were thereby in possession of the Defendants' ill-gotten gains.

## DEFENDANTS AND RELIEF DEFENDANTS

11.     **Kevan Casey**, age 52, resides in Houston, Texas.  Casey is self-employed.  Casey is the manager and 100% beneficial owner of Relief Defendants Vertical Holdings, Dover Hill, GSK, and Carmel Ventures through the Silver Creek Holdings Trust, of which he is the trustee and sole beneficiary.  Vertical Holdings is a Colorado limited liability company.  Vertical Holdings was a shareholder of Soliton from at least April 2018, CNS from at least December 2018, EBET from at least October 2020, Volcon from at least September 2020 and Sidus Space from at least September 2021, and sold shares of those companies.  Dover Hill is a Wyoming limited liability company.  Dover Hill was a shareholder of EBET from at least September 2020, Volcon from at least October 2021 and Sidus Space from at least December 2021, and sold shares of those companies.  GSK is a Wyoming limited liability company.  GSK was a shareholder of CNS from at least April 2019, EBET from at least July 2020 and Volcon from at least October 2020, and sold shares of those companies.  Carmel Ventures is a Wyoming limited liability company.  Carmel Ventures was a shareholder of Soliton from at least August 2019, and sold shares of Soliton.  Casey negotiated contracts on behalf of Vertical Holdings, Dover Hill, GSK and Carmel Ventures and held control over the disposition of securities they held. Although Casey appointed nominee managers of these entities, Casey directed the disposition of

securities held by these entities.  Casey previously was an officer, director, and/or 10% shareholder of three other public companies.

12.     **Jonathan Friedlander**, age 42, resides in La Jolla, California.  Friedlander is self-employed and is the sole beneficial owner of Relief Defendant Esports Group.  On or about July 13, 2020, Friedlander formed Esports Group, a Wyoming corporation, using a nominee officer as a vehicle for the specific purpose of owning stock in EBET.  Esports Group was a shareholder of EBET from at least September 2020, and sold shares of EBET.  Friedlander negotiated contracts on behalf of Esports Group and had control over the disposition of securities it held.  Friedlander made decisions on whether to buy or to sell EBET securities in the brokerage account of Esports Group.  Friedlander was named as a defendant in the LuxeYard Litigation.  Friedlander has been an officer and/or director of several private companies.

13.     **Adrian James**, age 49, resides in Austin, Texas.  James is self-employed and is the manager and 100% beneficial owner of Relief Defendants ALS Investments and Highbridge Consultants, and the trustee and sole living beneficiary of ASJ Living Trust.  James was a co-founder and director of Volcon.  ALS Investments is a Wyoming limited liability company.  ALS Investments was a shareholder of Soliton from at least April 2018, and sold shares of Soliton.  Highbridge Consultants is a Wyoming limited liability company.  Highbridge Consultants was a shareholder of Soliton from at least February 2019, and sold shares of Soliton.  ASJ Living Trust is a trust formed under the laws of Texas.  ASJ Living Trust was a shareholder of Soliton from at least April 2018, and sold shares of Soliton.  James negotiated contracts on behalf of ALS Investments, Highbridge Consultants and ASJ Living Trust, and had control over the disposition of securities they held.

14.     **Robert Wheat**, age 44, resides in La Jolla, California.  Wheat is self-employed and is the 100% beneficial owner of Relief Defendants Oak Grove and YSW Holdings.  On or about July 13, 2020, Wheat approved the formation of YSW Holdings, a Wyoming corporation,

using a nominee officer as a vehicle for the specific purpose of owning stock in EBET.  YSW

Holdings was a shareholder of EBET from at least September 2020, and sold shares of EBET.

YSW Holdings had no other business operations.  Wheat negotiated contracts on behalf of YSW

Holdings and had control over the disposition of securities it held.  YSW Holdings did not take

any actions in disposing EBET securities that were not approved by Wheat.  Wheat was the sole

source of YSW Holdings' funding.  Wheat, at his instruction, received proceeds from YSW

Holdings' sales of EBET stock.  Oak Grove was formed as a Nevada corporation in 2013 with

Wheat as the sole officer and director.  Oak Grove was a shareholder of EBET from at least

April 2021, and sold shares of EBET.  Wheat was named as a defendant in the LuxeYard

Litigation.  Wheat has been an officer and/or director of several private companies including one

which Wheat co-founded with Friedlander and in which Casey is an investor.

### THE MICROCAP COMPANIES

15. CNS is a clinical-stage pharmaceutical company incorporated in Nevada and

headquartered in Houston, Texas.  Its common stock is registered with the Commission pursuant

to Section 12(b) of the Exchange Act and trades on the Nasdaq under the "CNSP" symbol or

ticker (a set of capital letters assigned to a security for trading purposes).  CNS commenced

public trading at $4.50 per share in November 2019 with a market capitalization of

approximately $62.8 million.  CNS currently trades for the equivalent of less than $0.01 per

share (as compared to its initial public trading price) with a market capitalization of

approximately $1.75 million.

16. Soliton was a medical device company incorporated in Delaware and

headquartered in Houston, Texas.  Its common stock was registered with the Commission

pursuant to Section 12(b) of the Exchange Act and traded on the Nasdaq under the "SOLY"

symbol or ticker.  Soliton commenced public trading at $5.00 per share in February 2019 with a

market capitalization of approximately $73 million.  Soliton was acquired by AbbVie, Inc. on

December 16, 2021, and the registration of its common stock was terminated on December 28, 2021.

17.     EBET is an online gambling platform operator incorporated in Nevada and headquartered in Las Vegas, Nevada.  Its common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act and is traded on OTCQB (whose parent company is OTC Markets Group Inc.) under the "EBET" symbol or ticker after being delisted from the Nasdaq.  EBET commenced public trading at $6.00 per share in April 2021 with a market capitalization of approximately $62.4 million.  EBET's stock currently trades for the equivalent of less than $0.01 per share (as compared to its initial public trading price) with a market capitalization of approximately $749,000.

18.     Volcon is an electric off-road vehicle design and sales company incorporated in Delaware and headquartered in Round Rock, Texas.  Its common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and is traded on the Nasdaq under the "VLCN" symbol or ticker.  Volcon commenced public trading at $5.50 per share in October 2021 with a market capitalization of approximately $62.4 million.  Volcon stock currently trades for the equivalent of less than $0.01 per share (as compared to its initial public trading price) with a market capitalization of approximately $6.0 million.

19.     Sidus Space, Inc. is a space exploration company incorporated in Delaware and headquartered in Merritt Island, Florida.  Its common stock is registered under Section 12(b) of the Exchange Act and is traded on the Nasdaq under the symbol "SIDU."  Sidus Space commenced public trading at $5.00 per share in December 2021 with a market capitalization of $81 million.  Sidus Space stock currently trades for the equivalent of less than $0.03 per share (as compared to its initial public trading price) with a market capitalization of approximately $9.7 million.

## JURISDICTION AND VENUE

20.     This Court has subject-matter jurisdiction over this action pursuant to Section

22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the

Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78aa].

21.     The Court has personal jurisdiction over Defendants and Relief Defendants

because, among other things, all of the Defendants reside in the United States and all of the

Relief Defendants have principal places of business and transact business in the United States.

22.     Venue lies in this District pursuant to Section 22(a) of the Securities Act [15

U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because Defendant

Kevan Casey resides in Houston, Texas and has transacted business in this District.  Defendant

Casey's business entity Vertical Holdings has a principal place of business in this District.

Casey's co-defendants transacted business with him and/or his business entities while Casey was

located in this District.

23.     In connection with the conduct alleged in this Complaint, Defendants, directly

and indirectly, singly or in concert with others, made use of the means or instruments of

transportation or communication in interstate commerce and of the mails.

## FACTUAL ALLEGATIONS

### A.     Applicable Federal Securities Laws and Concepts

24.     Defendants engaged in a fraudulent scheme to conceal their involvement and

holdings in companies that were "microcap stocks."  These companies had stock that traded for

prices less than $5 per share, which are commonly known as "penny stocks."  Microcap stocks

are those with lower market capitalizations, usually less than $250 to $300 million.  Microcap

companies typically have limited assets and operations.  They often have products and services

that are still in development or have yet to be tested in the market.  Their stocks tend to be low

priced and trade in low volumes, making their prices subject to high volatility – meaning their prices could have large swings up or down based on the volume of trading activity.

25.     An initial public offering – or IPO – generally refers to when a company first sells shares of its stock to the public.  Under the federal securities laws, a company may not lawfully offer or sell shares unless the transaction has been registered with the SEC or an exemption applies.  To register an offering, a company is required to file a registration statement with the SEC, typically using Form S-1.  The registration statement provides information regarding the terms of the securities being offered as well as disclosure regarding the company's business, financial condition, management and other matters that are key to deciding whether the offering is a good investment.

26.     Form S-1 registration statements must also disclose the name of any person who within the past five years has acted as the company's "promoter," which in that context means "any person who, acting alone or in conjunction with one or more other persons, directly or indirectly takes initiative in founding and organizing the business or enterprise" (the "public company promoter").  Any thing of value the public company promoter received or will receive from the company must also be disclosed along with the nature and amount of the things of value.  Further, any assets acquired or to be acquired by the company from the public company promoter must be disclosed along with the amount at which the assets were or are to be acquired, the principle followed in determining such amount, and the identity of the person making that determination.  If the assets were acquired by the promoter within two years prior to their transfer to the company, the S-1 must also disclose the cost of the assets to the public company promoter.

27.     IPOs of all but the smallest of companies are offered to the public through an underwriter, a firm that agrees to purchase the shares from the issuing company and then sell the shares to investors.  The underwriter, typically in consultation with the company, decides on the

basic terms and structure of the offering before trading starts, including the percentage of shares

sold to persons prior to the IPO – called allocations or subscriptions.

28.     Underwriters typically sell allocations or subscriptions to institutional and

wealthy investors who are better able to buy large blocks of IPO shares, assume the financial

risk, and hold the investment for the long term.  Individual investors more often are able to

invest in new companies by purchasing shares when they are resold by the IPO subscribers in the

public market in the days following the IPO.

29.     Pre-existing shareholders can also sell their shares in the IPO if their shares are

included in and registered as part of the offering.  Shares held by such shareholders are included

in the IPO and the shareholders are called "selling shareholders."  The federal securities laws

contain a number of disclosure requirements as to selling shareholders.  The registration

statement discloses the number of shares each selling shareholder currently owns, plans to sell in

the offering, and will retain following the offering under Principal and Selling Shareholders or a

similarly captioned section.  Companies must also disclose any position, office or other material

relationship each selling shareholder has had with the company within the past three years, so

that public investors can discern the relationships the selling shareholders have had with the

company and what proportion of their respective holdings is being sold.

30.     The trading price of a new publicly registered stock may be affected by a limited

supply of shares in the market immediately following an IPO.  The shares being traded on the

first day are generally only shares that were sold in or registered with the IPO.  All other

outstanding shares, such as those held by founders, early investors and employees that have not

been included in the IPO, may often not be sold in the public market so soon after the IPO, either

because they are "restricted securities" under the federal securities laws that can only be resold

without registration under certain circumstances, or because the existing shareholders have

entered into a "lock-up agreement" in which they agree not to sell their shares for a certain period of time, typically 180 days.

31.    Stocks are susceptible to dramatic price movements in the first few days of public trading given their stock prices are unsettled and the possibly heightened interest in new companies, especially where hype is created around them.  In fact, some microcap companies pay persons or entities to recommend or "tout" stock ("stock promoters") in unsolicited electronic communications, such as emails, texts, social media posts or internet chatrooms. Federal securities laws require the disclosure of the source, amount, and type of compensation for the promotion.  Furthermore, stock promoters – and those who direct them – are prohibited under federal securities law from recommending the public to purchase the stock at the time they are selling the stock.

32.    The federal securities laws also require certain disclosures when a person or group of persons who "agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer" acquires beneficial ownership of more than five percent of a registered class of a company's equity securities.  First, those persons or groups are required to file a Schedule 13D or 13G with the SEC.  Schedules 13D and 13G are commonly referred to as "beneficial ownership reports."  The term "beneficial owner" is defined under SEC rules.  It includes any person who directly or indirectly has or shares voting power or investment power, which includes the power to sell or direct the sale of the security.  Second, those persons or groups – and certain transactions they have entered into with the issuer – must be identified in registration statements and other company SEC filings.

**B.    Casey's Background in Using Promotion of Public Companies to Profit from Sale of Securities**

33.    In or about 2016, Casey began what became a serial process to generate securities trading profits by acquiring significant ownership positions in microcap companies, shepherding

13

them through the public securities offering process, and coordinating marketing and stock promotion campaigns.  Casey initially identified future public companies through inventions being developed at a local medical research center.  It was through this process that Casey met a professor at the research center (the "Professor").  In approximately 2015, Casey became involved in Moleculin Biotech Inc. ("Moleculin"), a venture the Professor was founding with a biotech executive (the "Moleculin/Soliton CEO").  In addition to investing, Casey signed a consulting agreement with Moleculin to work on investor relations and business operations.  Casey introduced Moleculin to an underwriter and lawyer he thereafter continued to use in the ensuing scheme with other microcap companies.  Casey also worked with James, a long-time friend, on marketing and other efforts to take Moleculin public.

34.     Casey has used much the same pattern of conduct on subsequent microcap companies (with details as to each company described below).  First, Casey embedded himself in the company by amassing a large block of shares in the names of LLCs he controls and positioning himself as a "consultant" to the company on various marketing and financing matters, especially the going-public process.

35.     Casey aimed to have the company list on the Nasdaq, sometimes looking to minimally satisfy Nasdaq's requirements for the listing of an IPO and other times looking for "Nasdaq shells" for reverse merger.  In a reverse merger transaction, an existing public "shell company," which is usually a public reporting company with few or no operations, acquires a private operating company whereby the shareholders of the private operating company exchange their shares for a large majority of the shares of the public company. Although the public shell company survives the merger, the private operating company's shareholders gain a controlling interest in the voting power and outstanding shares of stock of the public shell company. The assets and business operations of the post-merger surviving public company are primarily, if not solely, those of the former private operating company.

36.     Casey recruited friends to pose as the manager of entities through which he purchased and sold shares.  Casey coordinated marketing and stock promotions before publicly selling the shares held personally or in the names of those nominee entities.  Throughout, Casey deliberately concealed his involvement from the investing public for a specific reason: the LuxeYard Litigation.

### C.     Impact of the LuxeYard Litigation

37.     Casey was experienced with securities reporting requirements.  From 2004 to October 2010, Casey had filed at least 36 beneficial owner reports with the Commission as the officer, director, and 10% shareholder of three public companies.  But then beginning in 2012 Casey was the central figure in the LuxeYard Litigation, a span of at least 38 private lawsuits in federal and state courts across four states stemming from Casey's orchestration of a fraudulent manipulation of the stock of LuxeYard, a microcap company.

38.     As stated in a Form 8-K publicly filed with the Commission in January 2013, LuxeYard first "filed suit against Defendant Kevan Casey and his associates for manipulation of the Company's stock price."  Casey settled the case within days of its filing.  Nonetheless, Casey remained the main subject in several other lawsuits against his alleged co-conspirators, including Friedlander, Wheat, and a friend who is one of the nominees Casey used here ("Casey Nominee # 1").

39.     For example, in 2017, a trial court conducted a bench trial and entered a judgment in favor of LuxeYard on its claim that Casey and others conspired in Casey's violations of his fiduciary duties as LuxeYard's undisclosed control person.  In October 2019, the appellate court affirmed the trial court with pages of factual findings of Casey's misconduct, including 23 bulleted ways Casey controlled LuxeYard and enlisted, among others, Friedlander through the going-public process and ensuing manipulation of the stock price amid stock promotion campaigns.  For example, the court noted that Casey "gave Friedlander 2.5 million shares of

free-trading stock in LuxeYard with instructions to sell them to fund the misleading advertising in support of the pump-and-dump scheme." The published opinion also identified Casey Nominee # 1 by name.

40.     Casey understood that these findings were damaging, as broker-dealers affirmatively closed his accounts based on their due diligence on him. While taking a similar role as he did with microcap LuxeYard on the series of microcap issuers here – and using some of the same associates – Casey and the other Defendants purposefully hid themselves from the investing public by, among other things, creating nominee entities with appointed officers, subject to their control, to hold and dispose of their stock holdings, and falsely representing these nominee entities (or their officers) as the only beneficial owners of the stock. Defendants' evasion of required disclosures harmed public investors who were deprived of material information to assess the value of those securities and suffered aggravated pecuniary losses given precipitous stock price drops in all the stocks during periods of their public trading.

**D.     CNS – Casey as Undisclosed Public Company Promoter**

41.     In 2017, Casey began working on what would become CNS. After working with Casey on Moleculin, the Professor approached Casey to help organize a business entity for developing a drug technology currently licensed by the medical research center.

42.     The Professor viewed himself and Casey as the "cofounders" of CNS. Casey provided initial funding for the venture through convertible promissory notes by which he could convert the debt into shares at a rate of $0.0138 per share. The entire note could be converted upon an IPO (or "Qualified Offering").

43.     Casey worked together with the Professor to form what would become the public company. Casey helped select officers, directors and scientific advisory board members, and introduced the Professor to CNS's first CFO and incorporator. After CNS was formed, but prior to its IPO, Casey entered into a consulting agreement with CNS via his nominee entity GSK.

CNS compensated Casey through GSK with a mix of cash and warrants. A warrant is a contract that gives the holder the right to purchase from the company a certain number of additional shares of common stock in the future at a certain price.

44.     Casey then worked to take CNS public per the pattern described above.  Casey provided comments on draft SEC filings, advised on press releases, assisted in the search for additional drug technologies to add to the company's portfolio, and introduced CNS to multiple consultants.  Notably, Casey introduced the company to James, with whom Casey had also worked on taking Moleculin public.  Pursuant to a consulting agreement identical to Casey's, James organized a crowdfunding campaign and advised on website design and contents, marketing efforts, and investor materials.  Casey also approached a stock promoter, Ahmed Alomari, to promote CNS around its IPO, and negotiated Alomari's agreement with CNS.

45.     All the while, Casey amassed millions of shares in CNS.  CNS began public trading in November 2019 upon the effectiveness of a Form S-1 registration statement making no mention of Casey.  Casey has not been mentioned in any other SEC filing regarding CNS.

46.     In 2020 and 2021, Casey sold almost 2 million CNS shares on the open market.  Ultimately, Casey sold the remainder of his shares in CNS in 2022 after a disagreement with CNS management about press release strategy.  Overall, Casey earned approximately $3.2 million in profits from his work on CNS while purposefully evading the legal requirements to disclose his identity as a public company promoter of CNS.

**E.     Soliton - Casey and James as Undisclosed Group, Selling Shareholders, and "Consultants"**

47.     At the same time as the CNS transactions were unfolding, Casey and James worked even more closely together to take another microcap company, Soliton, public.  The Moleculin/Soliton CEO was the Chief Executive Officer of both Moleculin and Soliton.  In early 2018, the Moleculin/Soliton CEO approached Casey and James jointly to see if they would

finance the still-developing company and work together to take it public.  According to the Moleculin/Soliton CEO, he wanted Casey and James to be a "team of shareholders" based on his experience working with them on Moleculin.

48.     Casey conveyed to the Moleculin/Soliton CEO that he and James wanted to be involved, together, in the process of preparing Soliton to make a public offering of stock.  In April 2018, Casey and James agreed to invest the same amount of money in Soliton by signing the same Note Purchase Agreement.  In return for each investing $125,000, Casey and James received a convertible note by which they could convert the debt into shares of common stock at a conversion rate of $0.175 per share upon a "Qualified Offering," which was defined as an offering of up to 2,000,000 shares (amended in August 2018 to 3,000,000 shares) at a price of at least $5.00 per share.  The Note Purchase Agreement also gave Casey and James veto power over pre-IPO financings below certain thresholds.

49.     The Note Purchase Agreement also contained a "4.99% blocker" so that each of Casey and James could not convert the note into shares of common stock that would cause either of them individually to own more than 4.99% of Soliton's registered class of stock.  Casey wanted the blocker to avoid the requirement to file beneficial ownership reports with the SEC, but the blockers did not prevent the legal requirement for Casey and James to disclose their aggregate holdings.

50.     Casey and James agreed amongst themselves not just to finance Soliton through the same Note Purchase Agreement, but also to work together to take Soliton public.  Casey and James sought to enter into a joint agreement with Soliton for compensation for their services.  On July 13, 2018, Casey emailed the Moleculin/Soliton CEO (copying James) to "modify the [Moleculin] consulting agreement that I have for our Soliton arrangement and send it to us."  Casey and James then sought hundreds of thousands of warrants and a "$200K+" cash

component in return for their services.  By email dated August 12, 2018, Casey further

negotiated the terms by which both he and James would be compensated for their services.

51.     Casey and James did not reach a compensation agreement with Soliton prior to

the IPO.  Rather, Casey and James did all their pre-IPO work together to advance their common

goal to take Soliton public and later sell their shares in the public market.  The terms of their

Note Purchase Agreement underscored that they shared that common goal from the onset, as it

required Soliton to use its best efforts to commence a securities offering with the Commission

within 90 days.

52.     Casey and James took a substantial role in the going-public process.  In

compliance with Casey and James' Note Purchase Agreement, Soliton filed a draft registration

statement on June 15, 2018.  Whereas Casey and James had just recently purchased a note

convertible into shares at $0.1875 per share, the draft registration statement specified the IPO

price would be $5.00 per share.  Casey and James together worked with Soliton executives to

select the underwriter (Underwriter B), recruit investors, coordinate the timing and terms of pre-

IPO and IPO rounds, and formulate the marketing efforts and investor materials.  For example,

electronic calendar invitations reflect that from June 2018 until the IPO in February 2019,

Soliton executives invited Casey and James together to at least 27 private meetings regarding the

going-public process, with at least 8 of those meetings being with the IPO underwriter to discuss

such things as "IPO Strategy Discussion" and "IPO Timing and Assignments."

53.     Ultimately, both the volume and price of the Soliton IPO exactly matched the

minimum requirements of a "Qualified Offering" under Casey and James' Note Purchase

Agreement – up to 3,000,000 shares at a price of at least $5.00 per share.  In other words, the

IPO was structured exactly to allow Casey and James to convert their notes into Soliton shares

upon the IPO.

54.     Casey and James also agreed to sell some of their Soliton shares together to support their Soliton objectives.  In 2018, Casey and James simultaneously sold the same number of shares to W.R., a person in the business of assisting companies with the offer and sale of securities, at the same discounted price to induce W.R. to assist Soliton in the going-public process.  Casey and James agreed that they saw value in using W.R. and agreed to sell him shares because it was a benefit to them both for W.R. to be involved in the offering of Soliton stock.

55.     After the IPO, Casey and James continued to work together on – and acquire and sell shares of – Soliton with the same common objective.  Casey and James jointly negotiated and simultaneously entered into identical Consulting Agreements with Soliton effective just a few days after the IPO by which they each received 87,500 shares for the same scope of "public markets" services.  Casey and James understood that they were receiving equal compensation because Soliton viewed them as contributing services of substantially similar value to the company's efforts to make a public securities offering.

     i.     <u>Casey and James Agreed to Sell Stock Together to Pay for Promotions</u>

56.     Casey and James together approached stock promoter Alomari by email to promote Soliton's stock in March 2019.  Alomari has conducted stock promotional activities through several means, including: (1) X f/k/a Twitter (under such names as IBuyCheapStocks and CheapStocksUs); (2) Facebook; (3) Instagram; (4) the Investors Underground public chat room; (5) Alomari's www.nasdaqstocks.com website; and (6) "Nasdaq Stock Alerts" text blasts to a list of phone numbers maintained by Alomari.

57.     Casey and James approached Alomari weeks after Soliton's IPO, and at a time when Casey and James had shares becoming unrestricted.  By text dated March 3, 2019, James told Alomari that Soliton "is going to be a great deal."  That same day, Alomari told James he would "make it happen for you guys."

58.     On March 6, 2019, Casey emailed Alomari (copying James) a detailed list of anticipated promotions for Alomari to "[i]ntroduce the company to all of your twitter, email and social media contacts," and do "Message board posts – ongoing basis" and "Social media outreach." Casey proposed for Alomari to be paid in cash by Soliton and "[s]eparately, Adrian [James] and/or I [Casey] will sell" him stock at a steeply discounted price.

59.     Two days later, on March 8, 2019, Alomari began promoting Soliton on Twitter. Alomari coordinated the promotion with James by private chat, asking James to "[g]ive me three competitor tickers" and other content. Alomari then sent James a screenshot of a tweet (with competitor tickers) from Alomari's IBuyCheapStocks account: "$SOLY interesting concept. Sexy theme w ultra low float Looking to swing this 1-2 months personal target $7+ #stocks $TRIL $MBOT $DCAR $ADIL;" while Soliton stock was trading below $5 per share.

60.     In stock equities, a "float" refers to the number of shares available for public trading. As noted above, microcap companies typically trade in lower volumes with fewer shares outstanding (in other words, a "low float"), making their prices subject to larger price swings based on trading activity.

61.     Later that afternoon, Alomari messaged James suggesting responsibility for creating buying activity, saying: "Quick $200k in 100% PURE buying today." That same day, Alomari also texted Casey and James "already rocking it for you guys."

62.     On March 12, 2019, Alomari tweeted again about Soliton as "Multi Billion dollar market Ultra low float could rip $7-10+ easy," while Soliton was publicly trading below $5 per share.

63.     Casey and James' initial proposal to Alomari on behalf of Soliton included compensation in the form of stock they would together "sell" him. Alomari eventually signed a "Consulting Agreement" with Soliton effective April 29, 2019, by which he would receive

25,000 shares of restricted Soliton stock, but Casey and James immediately thereafter agreed to dispose some of their own unrestricted shares in exchange for these 25,000 shares.

64.     Specifically, while Alomari kept promoting Soliton stock in May 2019, Casey and James agreed with each other to immediately transfer the same number of unrestricted Soliton shares that they personally owned (11,000 shares each) to Alomari in exchange for Alomari agreeing to deliver his 25,000 restricted shares equally to them (12,500 shares each) six months later.  On May 7, 2019, Casey sent Alomari and James identical "Option Agreements" by which each of Casey and James would transfer the same number of shares (11,000) and later receive the same number of shares (12,500) from Alomari.  Casey drafted the identical "Option Agreements" on behalf of both himself and James.  Casey and James signed the identical agreements, and transferred the same number of shares to Alomari in May-June 2019.

65.     In April 2019, Casey and James made a similar sale of an identical number of Soliton shares to Friedlander, to compensate him for losses in Casey and James' prior public company deal, Moleculin.

66.     In addition to engaging Alomari for stock promotions, Casey and James together formulated Soliton's press and marketing strategy.  For example, by email dated May 9, 2019, Casey emailed the Moleculin/Soliton CEO and Soliton's CFO (copying James) with a detailed schedule of 13 press and marketing events to take place between May 10, 2019 and June 7, 2019.  The Soliton CEO responded: "Looks like a good plan."  Soliton's CFO asked "what time are we thinking for the [press] release on [May] 13th?"  Casey replied: "The press for next Monday is to be released at 9AM EST."

67.     As of May 9, 2019, Casey's press schedule already contained an entry for Soliton to be receiving FDA approval regarding a Soliton product on May 28, 2019.  In fact, on May 28, 2019, Soliton issued a press release titled "Soliton Receives FDA 510(k) Clearance of its Acoustic Shockwave RAP Device."  That same day, Casey and James both deposited Soliton

shares in their brokerage accounts.  Casey started selling shares that day, and James started selling shares the following day (the same day that Alomari posted a promotional article about Soliton).  Between May 28, 2019 and June 5, 2019, Casey and James sold (either personally or through entities they controlled) 176,500 shares and 101,600 Soliton shares for approximately $3.4 million and $2.3 million in sales proceeds, respectively, in the public market.

      ii.  <u>Casey and James Evade Disclosing Their Identities in Required SEC Filings</u>

68.     Starting in June 2019, Casey and James jointly provided two more rounds of financing to Soliton through the simultaneous purchase of over 1.2 million shares.  Soliton agreed with Casey and James to register those shares for resale through the filing of two Form S-1 registration statements.  Casey had Casey Nominee # 1 sign the agreements with Soliton for the purchase and registration of the shares.

69.     For a shareholder's shares to be made part of a registration statement for resale, the federal securities laws require the selling shareholder and any person with dispositive control over the shares to be named.  The federal securities laws also require the disclosure of any "material relationship which the selling security holder has had within the past three years with the registrant or any of its predecessors or affiliates."  The federal securities laws also require "related party transactions" with 5%+ shareholders to be disclosed.

70.     In August 2019 and November 2019, Soliton filed two Forms S-1 naming Casey and James' entities as "selling shareholders."  Casey evaded disclosure in both filings by directing his friend and LuxeYard co-defendant, Casey Nominee # 1, to pose as the control person of the entity in whose name Casey purchased the shares, so that Casey Nominee # 1 – not Casey – would be named in the Form S-1 as the person with dispositive control over the shares.

71.     On June 28, 2019, Soliton's counsel sent a draft of the first Form S-1 registration statement to James and Casey Nominee # 1.  James was aware that Casey controlled the other

selling shareholder, and forwarded that email only to Casey (without copying Casey Nominee # 1).

72.     One of the documents Casey directed Casey Nominee # 1 to sign was a Form S-1 "selling shareholder questionnaire" requested by Soliton.  Casey had Casey Nominee # 1 sign several Soliton-related documents, including the questionnaire and agreements, using Casey Nominee # 1's middle name instead of his first name so Casey Nominee # 1's identity would be more difficult to trace given he was also a defendant in the LuxeYard Litigation.

73.     The questionnaire expressly stated that it was for purposes of the company's preparation of a Form S-1 for the registration of the resale of the selling shareholder's shares, and was to be signed by the "undersigned beneficial owner" of the shares.  The questionnaire also contained as "Exhibit A" a draft of the "Selling Stockholders" section of the Form S-1, with a blank space where the persons or persons with "voting and dispositive power over the shares" would be identified.

74.     The questionnaire asked for four items to be completed, including "Full Legal Name of Natural Control Person (which means a natural person who directly or indirectly alone or with others has power to vote or dispose of the securities covered by this Questionnaire)" and any "material relationship with the Company (or its predecessors or affiliates) during the past three years."  The Questionnaire expressly stated that "the undersigned consents to the disclosure of the information contained herein in its answers to Items 1 through 4 and the inclusion of such information in the Registration Statement" and "understands that such information will be relied upon by the Company in connection with the preparation and amendment of the Registration Statement."

75.     Casey submitted false selling shareholder questionnaires for the two Form S-1 registration statements filed by Soliton in August and November 2019.  Those questionnaires, among other things, listed only Casey Nominee # 1 as the control person with dispositive control

over the shares (whereas Casey was).  The questionnaires also did not disclose any relationships with Soliton, despite Casey's Note Purchase Agreement, Consulting Agreement, and other extensive involvement in taking Soliton public and promoting its stock.

76.     The two Forms S-1 ultimately identified Casey Nominee # 1 (by his alias) – not Casey.

77.     James was aware of Casey's role in the LuxeYard Litigation, in which the appellate court published its extensive findings on Casey in October 2019 (between the filing of the two Forms S-1).

78.     Like Casey, James used a nominee as the purported sole control person of his shares on the second Form S-1, when in fact James was that sole person with dispositive power over that entity's Soliton shares.  As a result, neither Casey nor James was named in the second Form S-1 that went effective in November 2019.

79.     The Forms S-1 also stated that the selling shareholders (entities 100% owned and controlled by Casey and James) " have not had any material relationship with [Soliton] other than participating in prior securities offerings," despite Casey and James' Note Purchase Agreement, Consulting Agreements, and other extensive involvement in taking Soliton public and promoting its stock.   In fact, the Forms S-1 described both the Note Purchase Agreement and Consulting Agreements, but not that they were with Casey or James.

80.     Nor did the Forms S-1 or other SEC filings disclose that Casey and James were a "group" owning more than 5% of the registered class of Soliton stock.  Nor did the Forms S-1 or other SEC filings disclose Casey and James' Note Purchase Agreement or Consulting Agreements as related party transactions with 5%+ shareholders.

     iii.  Casey and James Continue to Pay for Soliton Stock Promotions into Which
          <u>They Sell Their Soliton Stock</u>

81.     Casey and James continued to sell Soliton securities as they jointly directed Soliton's press and marketing efforts in the midst of their joint purchase and registration of Soliton shares.  On or about August 9, 2019, as the first Form S-1 for the resale of their shares was pending, Casey and James together urgently sought Alomari's help to promote Soliton. Alomari spoke with Casey and James together, and proposed that Casey and James personally compensate him for future stock promotions by foregoing their identical Option Agreements – *i.e.* let Alomari keep the 25,000 shares he was to turn over equally to Casey and James (12,500 shares each).

82.     Casey and James agreed with each other to accept Alomari's offer to forgo their options (worth at least $200,000 at the current market price) as payment for future promotions of Soliton stock.  The day after Casey and James agreed to forgo their options, James instructed Soliton's CFO (copying Casey) to send Alomari materials to "cover it to his database."  The following day, Casey emailed another stock promoter the final version of a press release with instructions to issue it after the market open, merely informing Soliton's CFO of the timing and cost of the promotion.

83.     The day after that (August 12, 2019), Alomari sent out three text blasts on Soliton, including: "Our alert on SOLY this morning @$8.80 hit a [sic] intraday high of $12.19 today!  Keep your eyes on SOLY over the next couple of weeks!"  On August 14, 2019, Alomari sent out another text blast and posted an article on his website touting Soliton.  Starting the next day, James publicly sold (personally or through entities he controlled) almost 100,000 shares for approximately $1.2 million in sales proceeds over the remainder of August 2019.  Casey and James then sold (personally or through entities they controlled) over 83,000 and 193,000 shares for approximately $1.1 million and $2.5 million in sales proceeds, respectively, in September

2019, and 183,500 shares and 122,550 shares for approximately $2.2 million and $1.5 million in sales proceeds, respectively, in October 2019.

84.     Casey and James were both aware of Alomari's text blasts, some of which had no disclosure regarding Alomari's compensation and no link to any article or other content.  On August 20, 2019, Soliton received a complaint from a recipient of Alomari's unsolicited text blasts.  Soliton's CFO forwarded the complaint to Casey and James and asked them to "please have [Alomari] cease doing anything related to Soliton today until we get to the bottom of this." Attached to the complaint were copies of text blasts with no disclosure of Alomari's compensation, and other promotional materials with inaccurate disclosures of his compensation by not mentioning Casey and James' compensation.  James privately chatted with Alomari about the text blast complaint, and thanked Alomari for contacting Soliton's CFO about it.

85.     Casey and James continued to sell (personally or through entities they controlled), as Alomari continued to tout, Soliton stock throughout 2020.  Alomari frequently chatted with Casey and James amid his continued promotion of Soliton stock in 2020.  For example, on July 6, 2020, Alomari sent Casey and James (in a private group chat) screenshots of an investor chatroom, including Alomari's post "I'm swinging for the fences.  Buyout target…"  Alomari told Casey and James "Pay attention to the times plz."  Also on July 6, 2020, Alomari sent Casey and James a link to a Seeking Alpha article on Soliton.  James told Alomari and Casey that the Seeking Alpha article did not appear to have a positive effect on the stock.  Alomari responded: "I'll distribute it and get some eyeballs on it."  Later that day, Alomari sent Casey and James a screenshot of a tweet "$SOLY MAJOR BOUNCE Potential and buyout target" with a link to the Seeking Alpha article.  Casey and James both gave Alomari "thumbs up" symbols in the chat.

86.     James (personally or through entities he controlled) sold Soliton shares in the public market starting that day and on each of the following 12 trading days (July 6 to 23, 2020), for a total of approximately 53,000 shares for approximately $438,000 in sales proceeds in the

public market.  Between July 7 and July 13, 2020, Casey (personally or through entities he controlled) sold approximately 90,000 shares of Soliton stock for approximately $709,000 in sales proceeds in the public market.

87.    On September 11, 2020, Alomari texted Casey and James "About to give SOLY a little nudge."  An hour later Alomari texted Casey and James screenshots of multiple tweets and Investors Underground posts he had made (with no disclosure of compensation), including "Personal Target $10-12+ near term" when the stock traded under $7 per share.

88.    On October 19, 2020, Alomari sent Casey and James screenshots of Twitter, Instagram and Investors Underground posts promoting Soliton telling them: "We're very close guys."  The Instagram post stated (without disclosure of compensation): "Your boy #PennyStockAdvice always does right by you!  $9.30 and climbing.  Multi month break out. 200 ma test if we build above we're looking at $10-12 fast.  2.2m shares are short and FDA and other catalysts are coming.  Squeeze time. W[ith] approval could see $15++."  The following day, Alomari texted Casey and James: "SOLY protected…Can run now."  In the remainder of 2020, Casey (personally or through entities he controlled) sold approximately 285,000 Soliton shares for approximately $2.3 million in sales proceeds in the open market.

### F.    EBET – Casey, Friedlander and Wheat as Undisclosed Public Company Promoters, Selling Shareholders, and/or Beneficial Owners

89.    The next public company targeted by Casey as part of the fraudulent scheme involved Friedlander and Wheat.  In May 2020, Casey and Friedlander identified an online gaming business being run through a private Belize entity of which Friedlander's business associate was a member and director (the "Belize entity member/director").  According to Friedlander, Casey and Friedlander "work[ed] together" to jointly finance the private entity and take the company through a public securities offering.

90.     Casey and Friedlander first engaged Casey's longtime underwriter, Underwriter B, to help find a "Nasdaq shell" for a reverse merger.  On June 17, 2020, Casey created a private group chat among Casey, Friedlander, and a principal of Underwriter B (the "Underwriter Principal").  On June 21, 2020, Casey and Friedlander told the Underwriter Principal they were "concerned about the 3pc reporting requirement and being classified as acting as a group potentially."  Nonetheless, Casey texted the Underwriter Principal in the private group chat: "We [Casey and Friedlander] had a couple of questions….Website and [PowerPoint] will be done and sent to you on Monday" so Underwriter B could send it to shell candidates.

91.     Casey and Friedlander continued to work with Underwriter B to find a shell merger candidate into at least September 2020.  After several attempts at finding a shell, Casey and Friedlander decided to take the private Belize entity public through an IPO.  To that end, Casey and Friedlander guided the Belize entity member/director to form a new Nevada corporation (as Casey did with CNS) as the business vehicle to make their planned public securities offering.

92.     On or about July 23, 2020, Casey, Friedlander, and their business associate Wheat provided unsecured loans in the same amount to the private Belize entity.  Wheat knew the three of them were lending the same amount to the private Belize entity, and knew the purpose of Casey, Friedlander, and his loans was to pay to clean up the private Belize entity's financial books and records.

93.     Registration statements must contain financial statements that are prepared by an independent auditor.

94.     Then, Casey, Friedlander, and Wheat – all three of whom were LuxeYard Litigation defendants – devised how to acquire substantial amounts of shares in the soon-to-be public company, but held in the name of persons other than them.  Friedlander and Wheat both set up new Wyoming corporations, on the same day, for the specific purpose of acquiring and

holding shares in the private Belize entity.  Both Friedlander and Wheat set up these nominee entities with nominee officers whom they controlled and with whom they had a relationship of trust and confidence.  Friedlander used his father and Wheat used his personal attorney who represented him in the LuxeYard Litigation.

95.     In or about July and August 2020, Casey, Friedlander, and Wheat each bought internet domains in the name of their nominee entities as a transactional front to receive substantial amounts of shares in advance of their planned public securities offering.  Casey and Friedlander agreed to acquire their shares together by purchasing internet domain names for $30,000-$48,000 each through a nominee entity.  Friedlander identified domain names that were available for sale, negotiated the purchase of the domain on behalf of Casey, and instructed Casey to pay for the domain.

96.     Meanwhile, on or about August 27, 2020, Wheat purchased domain names from the private Belize entity member/director for $18,000 in the name of Wheat's nominee entity, YSW Holdings.

97.     The sole purpose of Casey, Friedlander, and Wheat's domain purchases was to serve as a means to obtain shares in the soon-to-be public company while making it appear to be a bona fide, arms-length transaction with the private Belize entity.  These transactions were not arms-length.  Casey, Friedlander and Wheat extracted substantially more value from the company than the domains were worth.  At the time they purchased the domains, Casey, Friedlander, and Wheat had no intention to use those domains themselves.  Rather, even before acquiring the domains, they intended to assign those domains to the private Belize entity in return for an exorbitant number of shares compared to what they had to pay for the domains.

98.     According to Casey, he and Wheat discussed purchasing domains around the time Casey, Friedlander, and Wheat all purchased domains.  Casey understood that he, Friedlander, and Wheat would each have agreements with the private Belize entity to transfer domains.

Casey drafted a "Domain Purchase Agreement" by which Casey, Friedlander, and Wheat each would transfer the domains they had just purchased to the private Belize entity for a $700,000 promissory note convertible into 1,400,000 shares (a conversion rate of $0.50 per share) and a warrant to purchase at least 635,000 additional shares at an exercise price of $0.30 per share. Casey and Friedlander's agreements also had a cash payment due from the private Belize entity ($375,000 for Friedlander, $300,000 for Casey).

99.     Within days of Wheat's purchase of domains from the private Belize entity member/director, Casey, Friedlander, and Wheat entered into the Domain Purchase Agreements with the same effective date of September 1, 2020.  Casey, Friedlander, and Wheat were aware they had each entered into a similar Domain Purchase Agreement.  Each of Casey, Friedlander, and Wheat had his nominee sign the Domain Purchase Agreement with their nominee entity as the contracting party.  Those signed versions of the agreement were included as exhibits in the Form S-1 registration statement.

100.     The amounts Casey, Friedlander, and Wheat received under the Domain Purchase Agreements were exorbitant compared to what they had just paid for the domains, especially in light of the going rate for shares in the private Belize entity at the time.  Casey (in the name of GSK) had purchased shares in July 2020 from the private Belize entity at $1.50 per share. Moreover, on September 12, 2020, Casey texted a future EBET officer that a $2 pre-IPO round was being "upsized" (i.e., enlarged) "based on demand."  That same day, Casey texted Alomari that the IPO would be priced at $5 per share.

101.     At the $2 pre-IPO price, the 1,400,000 convertible shares alone of each of Casey, Friedlander, and Wheat were worth $2,800,000 (versus domains just bought for as low as $18,000).  Casey intended the consideration received under the agreement (convertible note, warrants, and cash) to compensate all of his activities to prepare the company and take it through the public securities offering.

31

102.     Soon after their Domain Purchase Agreements, Casey, Friedlander, and Wheat continued to take steps toward forming and launching the publicly traded company.  For example, on or about September 21, 2020, an EBET officer invited Casey and Friedlander to a "Weekly Update" with an agenda.  Friedlander forwarded the invitation to Wheat.  On or about November 10, 2020, the same EBET officer invited Casey, Friedlander, and Wheat to a "Weekly Board Update" that would be held on "Thursday moving forward per group request and recurrence.  I will send an update ahead of the call as usual."  Two day later, the same officer sent to Casey, Friedlander, and Wheat an agenda for the "Weekly Board Update" that included "S-1 Progress."

103.     In November 2020, EBET officers invited Casey, Friedlander, and Wheat to several other calls and meetings, including a "Board Member Interview" and "ESEG Jon/Kevan/Robert Weekly Update."  "Weekly Catchup" invitations to Casey, Friedlander, and Wheat continued into 2021.

104.     On or about December 1, 2020, an EBET officer emailed Casey and Friedlander about "meet and greets" with prospective investors.  Casey responded to the EBET officer and added Wheat to the response.

105.     As the IPO approached, on February 22, 2021, an EBET officer emailed Casey, Friedlander, and Wheat an invitation to meet with a stock promoter with whom Casey had previously worked on CNS and Soliton.

106.     In or about December 2020, Casey, Friedlander, and Wheat simultaneously bought shares from one of the founders of EBET's predecessor.  Friedlander and Wheat purchased the same number of shares at the same price.  On or about December 29, 2020, EBET's CFO sent Casey and Friedlander a draft agreement for each of Casey, Friedlander, and Wheat's entities to convert some of the shares under their Domain Purchase Agreements so that,

combined with the shares purchased from the EBET founder, each of Casey, Friedlander and Wheat "will have 519,277 [shares] post conversion."

107.    Casey and Friedlander controlled the structure and timing of the IPO, which took place in April 2021.  As early as September 2020, Casey and Friedlander told a future EBET officer "We are aiming for $5 on the ipo.  Timing still the same."  Casey and Friedlander decided to register their and Wheat's 519,277 shares as part of the IPO while "locking up" the shares of the founders, officers, directors, and pre-IPO investors for several months.  Casey drafted the lockup language with Friedlander, and sent it to the CFO to incorporate in agreements and the Form S-1.

      i.    Casey, Friedlander and Wheat Evade Legal Obligations to Disclose Their Identities and Material Relationships to EBET.

108.    In drafting the registration statement, EBET used a similar form "Selling Shareholder Notice and Questionnaire" as Soliton.  On or about February 21, 2021, EBET's CFO sent Casey and Friedlander the form Selling Shareholder Questionnaire and asked: "Can you guys get these filled out for each of the 4 entities represented on the selling shareholders table?"  Those four entities were Casey's, Friedlander's, and Wheat's nominee entities (Vertical Holdings, Dover Hill, Esports Group, and YSW Holdings).

109.    The Selling Shareholder Questionnaires for Casey, Friedlander, and Wheat's entities were all submitted within a two-day period.  On March 7, 2021, Friedlander sent an already-completed Selling Shareholder Questionnaire to his father to sign.  That same day, EBET received YSW Holdings' completed Selling Shareholder Questionnaire, which named only Wheat's lawyer and disclosed no material relationship with EBET, its predecessors, or its affiliates despite Wheat's purchase of the domains from EBET's predecessor's member and director (and control person of EBET's largest shareholder) for which Wheat (via YSW

Holdings) was receiving, among other things, a convertible note worth 1.4 million shares in the company.

110.    On or about March 8, 2021, Casey replaced Casey Nominee # 1 with another nominee ("Casey Nominee # 2") as the purported manager of Vertical Holdings and Dover Hill. However, Casey's appointment of Casey Nominee # 2 was limited only purportedly "to handle all dispositive (buying and selling) and voting control for all [EBET] shares."  That same day, Casey had Casey Nominee # 2 sign the Selling Shareholder Questionnaire for Vertical Holdings and Dover Hill (naming only Casey Nominee # 2 and disclosing no material relationship) and sent it to EBET.

111.    On March 9, 2021, Friedlander's wife sent to EBET Esports Group's Selling Shareholder Questionnaire, which named only his wife and disclosed no material relationships with EBET, its predecessors, or its affiliates.

112.    The three completed questionnaires were false and misleading in stating that the nominees were the only control persons with dispositive and voting control over the shares.  The completed questionnaires omitted the material information that Casey, Friedlander, and Wheat had dispositive control.  According to Casey, he used nominees to keep his name out of SEC filings given the LuxeYard Litigation, in which Friedlander and Wheat were also defendants.  So instead of a Form S-1 disclosing three LuxeYard Litigation defendants as the selling shareholders with agreements compensating them for efforts to take EBET public, the investing public was given the false impression that three shareholders had no apparent connection to each other and had merely sold domains to EBET at arms-length (versus as pre-determined passthroughs to acquire exorbitant amounts of shares).

113.    EBET's Form S-1 registration statement, which included the three Domain Purchase Agreements signed by the nominees as exhibits, was false and misleading in not naming Casey, Friedlander, and Wheat as those with dispositive control over the shares.  The

Form S-1 also did not disclose that the Domain Purchase Agreements were compensation for not just the transfer of domains, but also personal services and efforts to take EBET public.  Nor did the Form S-1 disclose that Casey, Friedlander and Wheat planned to use the transactions to extract more profit in future public securities offerings than they paid for the domains.

114.    Nor did the registration statement disclose the principle followed in determining the amount of consideration under the Domain Purchase Agreements, the identity of the person making that determination, and the cost of the domains to Casey and Friedlander.  Nor did the Form S-1 disclose that Wheat had just purchased the domains from the Belize entity member/director for the purpose of receiving the securities.

115.    Underwriter B took direction from Casey and Friedlander several times on the EBET IPO, including how to allocate IPO shares with W.R., who was in the business of assisting companies with the offer and sale of securities and whom Casey brought to the deal. On March 31, 2021, the Underwriter Principal asked Casey and Friedlander in the private group chat: "All SEC filings are in.  Do we want to launch the EBET IPO today with a April 12 pricing and effectiveness, April 13 first trade on Nasdaq?" Casey responded: "Makes sense to me."  The Underwriter Principal replied: "Ok."

116.    On April 3, 2021, the Underwriter Principal asked Casey and Friedlander in the private chat if they "want to do a call today to go over the EBET order book."  On April 12, 2021, Casey asked the Underwriter Principal if he had "reserve[d] a nasdaq ipo slot for" April 15.  The Underwriter Principal responded: "What time preferred?"  Casey replied: "My opinion is earlier the better."  The Underwriter Principal confirmed later that evening: "Nasdaq has given EBET the 9.50 to 10.00 [a.m.] Eastern trading open window."

117.    Casey, Friedlander, and Wheat also purchased additional shares in the IPO, and almost immediately started selling substantial amounts in the public market.  Casey, Friedlander, and Wheat subscribed to 146,376, 125,996, and 125,000 IPO shares in the names of Vertical

Holdings, Esports Group, and Oak Grove, respectively.  As a result of his purchase, Casey

acquired in excess of 5% - and, together with Friedlander more than 10% - of EBET's registered

class of securities.

> ii.    Casey and Friedlander Paid for EBET Stock Promotions Into Which They Sold
>        EBET Stock.

118.    Casey and Friedlander engaged Alomari to promote EBET's stock specifically at

the time of the IPO to try to boost market demand and increase the price into which they could

sell their shares.  Casey first told Alomari about EBET in September 2020 by private chat, with

Alomari telling Casey "Push for me I always give best effort but I'll go above and beyond."

Alomari soon entered a "Consulting Agreement" with EBET effective October 19, 2020, with an

"initial term of six months."

119.    Alomari's first promotional activity on EBET was a post on an investor chatroom

on April 1, 2021, that "EBET IPO going to be a huge one imo."  On April 2, 2021, Friedlander

started a Whatsapp group chat titled "Esports Intros," and invited Alomari to join.  That same

day, Friedlander provided Alomari with contact information for EBET personnel, moderated

communications between Alomari and an EBET officer regarding social media accounts and

content, and discussed the activities of another stock promoter for EBET.

120.    On April 9, 2021, Alomari texted Friedlander about EBET: "Are we all clear on

the IPO for [April 13] or is it pushed back?  I want to time things accordingly."  Friedlander

responded: "Looking more like [April 15]."  On April 14, 2021, Casey sent Alomari a press

release announcing EBET's IPO. Alomari responded: "Let's f__ing go."  Casey replied:

"Yepper."

121.    The EBET IPO was priced at $6.00 per share.  On April 15, 2021, the first day of

public trading, Alomari posted five times about EBET on Twitter and 8 times on Investors

Underground, an investor chatroom.  None of Alomari's posts disclosed that he was being compensated to promote EBET's stock.

122.    On that first day of public trading, several of Alomari's posts compared EBET to another issuer (UTime Ltd., ticker UTME) with an IPO the previous week where the shares spiked 875% on the first day of public trading and another 133% on the second day of public trading.  Near the end of EBET's first trading day, Alomari posted: "EBET approaching HOD's [highs of the day] eerily similar to UTME pull up a 60 min chart first 2 days."  EBET's stock similarly soared by 800% on its first two days of public trading.

123.    Back on Twitter at the end of the IPO day, the owner of Investors Underground tweeted: "Great call this AM $EBET @CheapStocksUs crushed the call in the room pre market wouldn't have made my radar otherwise."  On the second day of public trading, Casey, Friedlander, and Wheat (through entities they controlled) sold 191,667, 72,900, and 79,200 shares for approximately $7.8 million, $3.1 million and $2.5 million in sales proceeds, respectively, in the open market.

iii.   Casey Sells EBET Shares Subject to Restriction

124.    Casey also sold EBET shares in the three months following the IPO in excess of the amounts allowed under the federal securities laws.

125.    Generally, the federal securities laws make it unlawful for any person to offer or sell securities unless such offering or sale is registered with the Commission or is exempt from registration under Commission rules.  Commission Rule 144 creates a safe harbor from the registration requirement for persons seeking to resell securities that are not otherwise exempt from the registration requirements.  The Rule imposes certain threshold requirements, including a limit on the volume of shares that an "affiliate," which is defined in part as a "person that directly, or indirectly through one or more intermediaries, controls…such issuer," can sell in any

three-month period.  These holding periods serve to restrict stock sales and prevent holders from immediately dumping their stock into the public market.

126.    Casey controlled EBET from its onset through the going-public process by determining the organizational and capital structure (including whose shares would be registered or locked up), timing the IPO, and structuring Domain Purchase Agreements to obtain millions of dollars' worth of securities for use in planned public securities offerings for a domain he had just purchased for around $35,000.

127.    EBET had 13,048,769 shares outstanding upon the IPO.  Casey (personally or through entities he controlled) sold 393,460 EBET shares in the public market for approximately $12.3 million in sales proceeds in the three-month period starting April 15, 2021.

**G.  Volcon and Sidus Space – Casey as Undisclosed Beneficial Owner**

128.    Casey's next public company targeted as part of the scheme was Volcon, an electric bike manufacturer of which James was a co-founder.  In October 2020, Casey signed a "Consulting Agreement" by which he would receive a warrant to purchase 23,256 shares for providing "business advisory services" for an initial 6-month term.  James signed the agreement on behalf of Volcon.  According to James, Casey's services were to find investors for Volcon.

129.    In or about July 2021, Casey began to solicit friends and family to invest in the Volcon IPO.  Casey lent hundreds of thousands of dollars to a number of these investors for them to invest in the Volcon IPO.  The loans were interest-free and not in writing.  Casey also put the investors in contact with the IPO underwriter to open brokerage accounts there.  Casey eventually assembled 25 investors, including himself through three LLCs, to invest $11.5 million – over two-thirds of the offered shares – in the Volcon IPO.  Casey himself subscribed to over 26% of the shares in the Volcon IPO through his three LLCs.

130.    Casey also had preferred shares from pre-IPO investments which converted to common stock upon the IPO.  Overall, Casey owned 8.9% of Volcon's outstanding common

stock upon the IPO, and continued to own at least 5% for the first two months of public trading. However, neither Casey's ownership nor "consulting" relationship was ever disclosed in any SEC filings.

131.    Casey (personally or through entities he controlled) sold approximately 966,954 Volcon shares in the public market for approximately $11.9 million in sales proceeds from October 8, 2021 to December 17, 2021.

132.    In late 2021, Casey was approached by Underwriter B to invest in its upcoming IPO for Sidus Space, a microcap space exploration company.  Casey purchased shares in both a pre-IPO round and the IPO in December 2021.

133.    At the time of the IPO, Casey owned 18.7% of Sidus Space's registered class of common stock.  Casey purchased more shares on the open market starting the first day of public trading, owning a maximum of 37% of Sidus Space's registered class.

134.    In January 2022, Casey approached his lawyer about his Sidus Space holdings.  In turn, his lawyer wrote to Sidus Space's lawyer that "my clients are hoping to file their [Schedule] 13G tomorrow," and seeking a statement from Sidus Space that his clients did not own over 10% of its common stock.

135.    On April 21, 2022, Casey's lawyer sent a letter to Sidus Space and Casey saying he still represented "shareholders collectively representing more than 2 million [or 29% of all] Class A shares."  Casey continued to own at least 10% of the registered Class A shares through December 2022.  However, at no time did Casey file any form or schedule with respect to his ownership of Sidus Space shares.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### Violation of Section 17(a) of the Securities Act

### (All Defendants)

136.    The Commission repeats and incorporates by reference the allegations in paragraphs 1-135 above.

137.    By reason of the foregoing, each of Casey, Friedlander, James, and Wheat, directly or indirectly, acting intentionally, knowingly, recklessly, or negligently, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, in the offer or sale of securities: (a) has employed or is employing devices, schemes, or artifices to defraud; (b) has obtained money or property by making untrue statements of material fact or omitting material facts necessary to make the statements made not misleading; and (c) has engaged or is engaging in transactions, practices, or courses of business which operated as a fraud or deceit upon the purchasers of such securities.

138.    By reason of the conduct described above, each of Casey, Friedlander, James, and Wheat violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### SECOND CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder

### (Casey and Friedlander)

139.    The Commission repeats and incorporates by reference the allegations in paragraphs 1-135 above.

140.    By reason of the foregoing, each of Casey and Friedlander, directly or indirectly, acting intentionally, knowingly or recklessly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or the facilities of a

national securities exchange or the mail: (a) has employed or is employing devices, schemes, or artifices to defraud; (b) has made or is making untrue statements of material fact or has omitted to state material fact(s) necessary to make the statements made not misleading; and (c) has engaged or is engaging in acts, practices, or courses of business which operate as a fraud or deceit upon certain persons.

141.    By engaging in the conduct described above, each of Casey and Friedlander violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**THIRD CLAIM FOR RELIEF**

**Violations of Section 10(b) of the Exchange Act**

**and Rules 10b-5(a) and 10b-5(c) thereunder**

**(James and Wheat)**

142.    The Commission repeats and incorporates by reference the allegations in paragraphs 1-135 above.

143.    By reason of the foregoing, each of James and Wheat, directly or indirectly, acting intentionally, knowingly or recklessly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or the facilities of a national securities exchange or the mail has employed or is employing devices, schemes, or artifices to defraud; and has engaged or is engaging in acts, practices, or courses of business which operate as a fraud or deceit upon certain persons.

144.    By engaging in the conduct described above, each of James and Wheat violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) thereunder [17 C.F.R. §§ 240.10b-5(a), 10b-5(c)].

**FOURTH CLAIM FOR RELIEF**

**Violations of Section 13(d) of the Exchange Act and Rule 13d-1 Thereunder**

**(Casey, Friedlander, and James)**

145.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-135 above.

146.     Pursuant to Exchange Act Section 13(d) and Rule 13d-1 thereunder, persons who are directly or indirectly the beneficial owners of more than 5% of the outstanding shares of a class of voting equity securities registered under the Exchange Act are required to file a Schedule 13D within ten days of the date on which their ownership exceeds five percent.  The Schedule 13D filing requirement applies both to individuals and to two or more persons who act as a group for the purpose of acquiring, holding, or disposing of securities of an issuer.

147.     Casey and James constituted a group for the purposes of Exchange Act Section 13(d) and the Schedule 13D filing requirements with respect to Soliton.

148.     Casey and Friedlander constituted a group for the purposes of Exchange Act Section 13(d) and the Schedule 13D filing requirements with respect to EBET.

149.     Casey was under an obligation to file with the Commission true and accurate reports with respect to his ownership of Soliton, EBET, Volcon, and Sidus Space stock pursuant to Exchange Act Section 13(d) and Rule 13d-1 thereunder, but failed to do so.

150.     Friedlander was under an obligation to file with the Commission true and accurate reports with respect to his ownership of EBET stock pursuant to Exchange Act Section 13(d) and Rule 13d-1 thereunder, but failed to do so.

151.     James was under an obligation to file with the Commission true and accurate reports with respect to his ownership of Soliton stock pursuant to Exchange Act Section 13(d) and Rule 13d-1 thereunder, but failed to do so.

152.    By reason of the foregoing, Casey, Friedlander, and James violated, and, unless enjoined and restrained will continue to violate, Section 13(d) of the Exchange Act, 15 U.S.C. § 78m(d), and Rule 13d-1 thereunder, 17 C.F.R. § 240.13d-1.

## FIFTH CLAIM FOR RELIEF

### Violations of Section 16(a) of the Exchange Act and Rule 16d-3 Thereunder

### (Casey and Friedlander)

153.    The Commission repeats and incorporates by reference the allegations in paragraphs 1-135 above.

154.    Casey and Friedlander, after acquiring directly or indirectly the beneficial ownership of more than 10% of EBET's class of equity securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l], failed to file with the Commission a Form 3 providing an initial statement of beneficial ownership and, after effecting transactions in the securities, failed to file with the Commission Forms 4 and 5 providing statements of changes in beneficial ownership.

155.    Casey, after acquiring directly or indirectly the beneficial ownership of more than 10% of Sidus Space's class of equity securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l], failed to file with the Commission a Form 3 providing an initial statement of beneficial ownership and, after effecting transactions in the securities, failed to file with the Commission Forms 4 and 5 providing statements of changes in beneficial ownership

156.    By reason of the foregoing, Casey and Friedlander have violated, and unless restrained and enjoined will in the future violate, Section 16(a) and Rule 16a-3 of the Exchange Act, 15 U.S.C. § 78p(a) and 17 C.F.R. § 240.16a-3.

## SIXTH CLAIM FOR RELIEF

### Violations of Sections 5(a) and 5(c) of the Securities Act

### (Casey)

157.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-135 above.

158.     Casey, directly or indirectly, has made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell EBET securities, when no registration statement was in effect with the Commission as to such securities, and has made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell such securities when no registration statement had been filed with the Commission as to such securities.

159.     By reason of the foregoing, Casey violated, and unless restrained and enjoined will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a), (c)].

## SEVENTH CLAIM FOR RELIEF

### Violations of Section 20(b) of the Exchange Act

### (Casey, Friedlander, and Wheat)

160.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-135 above.

161.     Casey violated Section 20(b) of the Exchange Act [15 U.S.C. § 78t(b)] by knowingly or recklessly arranging for Casey Nominee # 1 and Casey Nominee # 2, whom Casey named as the purported managers of Vertical Holdings and Dover Hill, to sign false selling shareholder questionnaires submitted to Soliton and/or EBET.

162.     By knowingly or recklessly arranging for the signing of these documents with materially false and misleading information, Casey, directly or indirectly, through Casey Nominee # 1 and Casey Nominee # 2, engaged in acts through or by means of third parties that

would have been unlawful for him to do himself under Section 10(b) of the Exchange Act, 15

U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

163.    Friedlander violated Section 20(b) of the Exchange Act [15 U.S.C. § 78t(b)] by

knowingly or recklessly arranging for his wife, whom Friedlander named as the purported

officer and director of Esports Group, to sign a false selling shareholder questionnaire submitted

to EBET.

164.    By knowingly or recklessly arranging for the signing of this document with

materially false and misleading information Friedlander, directly or indirectly, through his wife,

engaged in acts through or by means of a third party that would have been unlawful for him to

do himself under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b)

thereunder, 17 C.F.R. § 240.10b-5(b).

165.    Wheat violated Section 20(b) of the Exchange Act [15 U.S.C. § 78t(b)] by

knowingly or recklessly arranging for his personal lawyer, whom Wheat named as the purported

officer and director of YSW Holdings, to sign a false selling shareholder questionnaire submitted

to EBET.

166.    By knowingly or recklessly arranging for the signing of this document with

materially false and misleading information, Wheat, directly or indirectly, through his personal

lawyer, engaged in acts through or by means of a third party that would have been unlawful for

him to do himself under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-

5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

167.    By reason of the foregoing, each of Casey, Friedlander, and Wheat violated, and,

unless enjoined, will continue to violate, Section 20(b) of the Exchange Act [15 U.S.C. § 78t(b)].

## EIGHTH CLAIM FOR RELIEF

### Unjust Enrichment

### (All Relief Defendants)

168.    The Commission repeats and incorporates by reference the allegations in paragraphs 1-135 above.

169.    Relief Defendants each obtained proceeds as part, and in furtherance, of the securities law violations alleged above without a legitimate claim to those proceeds, and under those circumstances it is not just, equitable or conscionable for them to retain the proceeds. Relief Defendants were unjustly enriched.

170.    Relief Defendants should each be ordered to disgorge the proceeds they received as a result of the Defendants' violations of the federal securities laws.

## RELIEF REQUESTED

WHEREFORE, the Commission requests that this Court find Defendants committed the violations alleged, and:

A.    Issue a permanent injunction prohibiting:

1.    Casey from violating Sections 5(a), 5(c) and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)]  and Sections 10(b), 13(d), and 16(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(d), 78p(a)] and Rules 10b-5, 13d-1, and 16a-3 thereunder [17 C.F.R. §§ 240.10b-5, 240.13d-1 and 240.16a-3], and prohibiting Casey from violating Section 20(b) of the Exchange Act [15 U.S.C. § 78t(b)];

2.    Friedlander from violating Section 17(a) of the Securities Act [15 U.S.C. § 77e(a)] and Sections 10(b), 13(d), and 16(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(d), 78p(a)] and Rules 10b-5, 13d-1, and 16a-3 thereunder [17

C.F.R. §§ 240.10b-5, 240.13d-1 and 240.16a-3], and prohibiting Friedlander

from violating Section 20(b) of the Exchange Act [15 U.S.C. § 78t(b)];

3. James from violating Section 17(a) of the Securities Act [15 U.S.C. § 77e(a)]

and Sections 10(b) and 13(d) of the Exchange Act [15 U.S.C. §§ 78j(b),

78m(d)] and Rules 10b-5(a), 10b-5(c) and 13d-1 thereunder [17 C.F.R. §§

240.10b-5(a), 240.10b-5(c), 240.13d-1];

4. Wheat from violating Section 17(a) of the Securities Act [15 U.S.C. § 77e(a)]

and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5

thereunder [17 C.F.R. § 240.10b-5], and prohibiting Wheat from violating

Section 20(b) of the Exchange Act [15 U.S.C. § 78t(b)];

B. Issue a permanent injunction prohibiting:

1. Casey from directly or indirectly, including, but not limited to, through any

entity owned or controlled by Casey: (i) participating in the issuance,

purchase, offer, or sale of any security; (ii) being the controlling shareholder

of the issuer of any security (which term "controlling shareholder" means the

possession, direct or indirect, of the power to direct or cause the direction of

the management and policies of an issuer, whether through the ownership of

voting securities, by contract, or otherwise); (iii) promoting any issuer of any

security, causing the promotion of any issuer of any security, or deriving

compensation from the promotion of any issuer of any security; for purposes

of this injunction, 'promoting' or 'promotion' means, directly or indirectly,

publishing, giving publicity to, or circulating any form of written

communication, whether electronic or hard copy, the goal of which is to

generate interest in any security; or (iv) soliciting any person or entity to

purchase or sell any security, or to hold any security, as nominee; provided,

however, that such injunction shall not prevent Casey from purchasing or selling securities listed on a national securities exchange for his own personal account;

2. Friedlander from directly or indirectly, including, but not limited to, through any entity owned or controlled by Friedlander: (i) participating in the issuance, purchase, offer, or sale of any security; (ii) promoting any issuer of any security, causing the promotion of any issuer of any security, or deriving compensation from the promotion of any issuer of any security; for purposes of this injunction, 'promoting' or 'promotion' means, directly or indirectly, publishing, giving publicity to, or circulating any form of written communication, whether electronic or hard copy, the goal of which is to generate interest in any security; or (iii) soliciting any person or entity to purchase or sell any security, or to hold any security, as nominee; provided, however, that such injunction shall not prevent Friedlander from purchasing or selling securities listed on a national securities exchange for his own personal account;

3. James from directly or indirectly, including, but not limited to, through any entity owned or controlled by James: (i) participating in the issuance, purchase, offer, or sale of any security; (ii) promoting any issuer of any security, causing the promotion of any issuer of any security, or deriving compensation from the promotion of any issuer of any security; for purposes of this injunction, 'promoting' or 'promotion' means, directly or indirectly, publishing, giving publicity to, or circulating any form of written communication, whether electronic or hard copy, the goal of which is to generate interest in any security; or (iii) soliciting any person or entity to

purchase or sell any security, or to hold any security, as nominee; provided, however, that such injunction shall not prevent James from purchasing or selling securities listed on a national securities exchange for his own personal account;

4.   Wheat from directly or indirectly, including, but not limited to, through any entity owned or controlled by Wheat, soliciting any person or entity to purchase or sell any security, or to hold any security, as nominee;

C.   Issue an Order directing Defendants and Relief Defendants to disgorge all ill-gotten gains or proceeds received as a result of the acts and/or courses of conduct complained of herein, with prejudgment interest thereon.

D.   Issue an Order directing Defendants to pay a civil money penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

E.   Issue an Order prohibiting Defendants pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6)(A) of the Exchange Act [15 U.S.C. § 78u(d)(6)(A)] from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock.

F.   Enter a Final Judgment barring Defendants pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act.

G.   Grant such other and further relief as may be necessary and appropriate.

H.      Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

## **JURY DEMAND**

The Commission demands a jury in this matter for all claims so triable.

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION

By its attorneys,

/s/David D'Addio
David J. D'Addio, *Pro Hac Vice Motion Pending*
Richard M. Harper II
Attorney-in-Charge
MA Bar No. 634782, *Pro Hac Vice Motion Pending*
Jeffrey T. Cook
Alexandra B. Lavin
Jonathan T. Menitove
U.S. Securities and Exchange Commission
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA 02110
(617) 573-8979 (Harper)
(617) 573-4590 (Facsimile)
HarperR@sec.gov

Dated: August 9, 2024