## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| Securities and Exchange Commission, | |
| Plaintiff, | |
| v. | |
| Kevan Casey, Jonathan Friedlander, Adrian James, and Robert Wheat, | Civil Action No. 4:24-cv-02971 |
| Defendants, | |
| Vertical Holdings, LLC, Dover Hill, LLC, GSK Strategies, LLC, Carmel Ventures, LLC, ALS Investments, LLC, Highbridge Consultants, LLC, Adrian James as the Trustee of the ASJ Living Trust, Esports Group, Inc., Oak Grove Asset Management, Inc., and YSW Holdings, Inc. | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT ADRIAN JAMES' AND RELIEF DEFENDANTS ALS INVESTMENTS, LLC'S, HIGHBRIDGE CONSULTANTS, LLC'S, ADRIAN JAMES AS THE TRUSTEE OF THE ASJ LIVING TRUST'S MOTION TO DISMISS THE COMPLAINT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................II

PRELIMINARY STATEMENT ............................................................................................1

STATEMENT OF ALLEGED FACTS ..................................................................................3

ARGUMENT ..........................................................................................................................7

   I.    THE SEC HAS FAILED TO PLEAD FACTS SUFFICIENT TO DRAW A REASONABLE INFERENCE THAT MR. JAMES VIOLATED SECTION 17(A)(2) .........................................................................9

   II.    THE SEC HAS FAILED TO PLEAD FACTS SUFFICIENT TO SUPPORT A VIOLATION OF SECTION 10(B) AND RULES 10B-5(A) AND 5(C) AND SECTION 17(A)(1) AND (3) .....................................12

      *A.   The SEC Has Not Adequately Alleged Inherently Deceptive Conduct by Mr. James Distinct from the Alleged Misstatements or Omissions in Soliton's Filings* ........................*13*

      *B.   The SEC Has Not Sufficiently Alleged Participation by Mr. James in Other Inherently Deceptive Conduct Where His Role Had the Primary Purpose and Effect of Creating a False Appearance* ........................................................................................................*15*

      *C.   The SEC Has Not Adequately Pled Scienter* ............................................................*19*

   III.   THE SEC'S SECTION 13(D) CLAIM SHOULD BE DISMISSED.........................................21

CONCLUSION ......................................................................................................................24

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)..................................................................................................8

*Augenbaum v. Anson Investments Master Fund LP,*
2023 WL 2711087 (S.D.N.Y. Mar. 30, 2023) .........................................................25

*Basic v. Levinson,*
485 U.S. 224 (1988)................................................................................................11

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)........................................................................................8, 9, 25

*Dawes v. Imperial Sugar Co.,*
975 F. Supp. 2d 666 (S.D. Tex. 2013).....................................................................11

*Enron Corp. Sec., Derivative & ERISA Litig.,*
2006 WL 6892915 (S.D. Tex. Dec. 4, 2006)...........................................................17

*GAF Corp. v. Milstein,*
453 F.2d 709 (2d Cir. 1971) ....................................................................................24

*Genius Brands Int'l, Inc. Sec. Litig.,*
2021 WL 12327975 (C.D. Cal. Aug. 30, 2021) .......................................................18

*Lowinger v. Morgan Stanley & Co. LLC,*
43 F. Supp. 3d 369 (S.D.N.Y. 2014) .......................................................................25

*Melder v. Morris,*
27 F.3d 1097 (5th Cir. 1994) ...................................................................................23

*Nano Dimension Ltd. v. Murchinson Ltd.,*
681 F. Supp. 3d 168 (S.D.N.Y. 2023) .....................................................................24

*Parmalat Sec. Litig.,*
414 F. Supp. 2d 428 (S.D.N.Y. 2006 ......................................................................14

*Rubenstein v. International Value Advisers, LLC,*
959 F.3d 541 (2d Cir. 2020) ....................................................................................25

*S.E.C. v. Daifotis,*
2011 WL 2183314 (N.D. Cal. June 6, 2011) ...........................................................18

*S.E.C. v. Syron,*
934 F. Supp. 2d 609 (S.D.N.Y. 2013) .....................................................................10

*SEC v. Blackburn,*
156 F. Supp. 3d 778 (E.D. La. 2015) .......................................................................21

*SEC v. Farmer,*
2015 WL 5838867 (S.D. Tex. 2015) ..................................................................15, 19

*SEC v. Fiore,*
416 F. Supp. 3d 306 (S.D.N.Y. 2019) .....................................................................19

*SEC v. Killion,*
2017 WL 7052310 (S.D. Tex. Mar. 24, 2017) .........................................................15

*SEC v. Lee,*
720 F. Supp. 2d 305 (S.D.N.Y. 2010) .....................................................................17

*Sec. & Exch. Comm'n v. Jaitley,*
2023 WL 9105678 (W.D. Tex. Nov. 13, 2023) ........................................................15

*Sec. & Exch. Comm'n v. Mueller,*
2024 WL 400897 (W.D. Tex. Jan. 11, 2024)............................................................14

*Sec. & Exch. Comm'n v. Narayan,*
2017 WL 4652063 (N.D. Tex. Aug. 28, 2017) ...............................................passim
*Sec. & Exch. Comm'n v. Rio Tinto plc,*
41 F.4th 47 (2d Cir. 2022)...........................................................................14
*Sec. & Exch. Comm'n v. Verges,*
716 F. Supp. 3d 456 (N.D. Tex. 2024)...............................................9, 14, 17, 22
*Stephens v. Uranium Energy Corp.,*
2016 WL 3855860 (S.D. Tex. July 15, 2016) .....................................9, 18, 20
*Tuchman v. DSC Communications Corp.,*
14 F.3d 1061 (5th Cir. 1994) .........................................................................23
*U .S. v. Hall,*
48 F. Supp. 2d 386 (S.D.N.Y. 1999) ...............................................................18

**Statutes, Rules and Regulations**

15 U.S. Code § 77q ..............................................................................9, 12, 19
15 U.S.C. §78m ....................................................................................22
17 CFR § 240.10b-5 .......................................................................1, 2, 12, 19
17 CFR § 240.13d-1 .......................................................................2, 21, 22
Fed. R. Civ. P. 12(b)(6) ..................................................................1, 3, 7
Fed. R. Civ. P. 9(b) ..............................................................................passim

Defendant Adrian James ("Defendant" or "Mr. James") and Relief Defendants ALS Investments, LLC ("ALS Investments"), Highbridge Consultants, LLC ("Highbridge"), and Adrian James as the Trustee of the ASJ Living Trust ("ASJ" and collectively "Relief Defendants") respectfully submit this Memorandum of Law in Support of their Motion to Dismiss Plaintiff Securities and Exchange Commission's (the "SEC" or "Commission") Complaint pursuant to Federal Rules of Civil Procedure ("Fed. R. Civ. P.") 12(b)(6) for failure to state a claim and 9(b) for failure to state a claim with particularity.

## PRELIMINARY STATEMENT

The SEC alleges that Mr. James participated in a scheme to defraud by purchasing, paying for promotions of, and selling stock in Soliton Inc. ("Soliton") without disclosing his ownership interest and relationship with Soliton to investors. The SEC buries its allegations against Mr. James amidst unrelated allegations against other defendants to mask the fact that its Complaint regarding Mr. James' work with Soliton fails to meet its burden to plead facts sufficient to show material misstatements or a coordinated scheme to defraud. Mr. James' involvement with Soliton was known to Soliton and disclosed to investors, as evidenced by multiple filed Forms S-1, where he was publicly named along with his entities.

Additionally, the SEC's allegations are based solely on omissions and/or misstatements and, therefore, inappropriately pled as scheme liability. Presumably, the SEC is pursuing scheme liability under Rules 10b-5(a) and (c) because it cannot raise a reasonable inference that statements made by Soliton in its filing about Mr. James' role

1

and relationship with Soliton were material to investors as required by Rule 10b-5(b). Meanwhile, the SEC did charge several other defendants in this matter under Rule 10b-5(b) for the same purported "scheme." Rules 10b-5(a) and (c) should not be used as a back door to liability when the core conduct alleged are misstatements or omissions.

Even if such conduct were adequate to find scheme liability—the SEC does not show that Mr. James substantially participated in deceptive conduct in furtherance of the purported scheme. There are no allegations that Mr. James caused untrue statements. Furthermore, Soliton's retention of a third party to raise awareness about the newly public company using truthful advertisements is in full compliance with the securities laws, as was Mr. James' decision to sell stock during the two-year period Soliton was public. Mr. James believed that Soliton was a "great deal" and it was. Two years after Soliton went public at $5.00 per share, it was purchased by a company called AbbVie Inc. (NASDAQ: ABBV) for $22.60 per share. A significant financial benefit for investors.

The SEC also does not sufficiently plead scienter. Mr. James had no role in the on-going LuxeYard, Inc. litigations that purportedly motivated the other defendants in this matter to hide their identities from the public. Nor can a complaint survive by pleading a general profit motive.

Finally, the SEC has not adequately pled that Mr. James was a "group" under Section 13(d). The purpose of 13(d) is to alert investors to any potential change in corporate control. There was no plausible risk of such a shift here because at all times Soliton was owned by its majority shareholder, Remeditex Ventures, LLC. Moreover, allegations that Mr. James and Mr. Casey acted in parallel does not trigger the "group"

disclosure requirements. Parallel conduct could just as easily be independent conduct. There must be more to show an agreement between two parties to act as a "group." Because the SEC's unjust enrichment claims are dependent on the three primary violations, the Relief Defendants should also be dismissed. The allegations simply do not satisfy the pleading standards under Fed. R. Civ. P. 12(b)(6) and 9(b).

## STATEMENT OF ALLEGED FACTS

Mr. James is a private investor, not a securities industry professional, living in Austin, Texas.[1] *See* Compl. ¶ 13. As an investor, he seeks out small companies that do not have the capacity or capability to tell their own stories and offers his skills in storytelling and marketing. *See, e.g. id.* ¶ 56-67. In early 2018, Soliton's CEO asked Mr. James to step into an investor role, help finance the company, and assist with taking it public. *Id.* ¶ 47. Soliton was one of the companies Mr. James believed showed great promise for its unique medical technologies and was a good investment. *Id.* ¶ 57. When Mr. James invested in Soliton, it was a private company with a single majority shareholder that exerted significant influence and control named Remeditex Ventures LLC (a venture capital fund) ("Remeditex"). *Id.* ¶¶ 16, 48; 53; Declaration of Mark Oakes dated February 21, 2025 ("Oakes Decl."), Ex. A at 27-28; *id.*, Ex. B at 27-28 ("single shareholder, Remeditex Ventures, LLC (Remeditex) will beneficially own and will be able to vote in the aggregate 60.82% of our outstanding common stock if the minimum number of shares are sold and 54.97% of our outstanding common stock if the maximum number of shares

---

[1] Mr. James manages and is the 100% beneficial owner of Relief Defendants ALS Investments and Highbridge Consultant and the trustee and sole living beneficiary of ASJ Living Trust. *See* Compl. ¶ 13.

offered are sold. As such, Remeditex, will continue to have the ability to exert significant influence over all corporate activities . . .”). Mr. James initially invested $125,000 in April 2018 under a Note Purchase Agreement in exchange for convertible notes, which converted into shares of common stock upon a "Qualified Offering," an offering of up to 3 million shares at a price of $5. Compl. ¶ 48. The Note Purchase Agreement contained a 4.99% blocker preventing Mr. James from owning more than 4.99% of Soliton's registered class of stock. *Id.* ¶ 49. Mr. Kevan Casey also invested in Soliton. *Id.* ¶ 48.

Because Mr. James believed in Soliton, he assisted with marketing, such as rebuilding their website, social media presence, rebranding, and video production efforts both during the going-public process and post-initial public offering ("IPO"), which required coordination with Soliton's management and underwriters. *Id.* ¶¶ 52, 56-67. To support Soliton, Mr. James even agreed pre-IPO to sell some of his personal Soliton stock to a third-party known for assisting companies in going public, giving up substantial upside in his ownership. *See id.* ¶ 54. After much effort, Soliton filed a draft registration statement on June 15, 2018 and successfully took Soliton public in February 2019 at $5.00 per share with a market capitalization of approximately $73 million. *See id.* ¶¶ 16, 52. During the first month of trading, Soliton's stock held steady around $5.00. *See* Oakes Decl., Ex. I at 2. In contrast to other defendants in this case, the SEC does not allege that Mr. James sold significant shares at inflated prices in the initial days of public trading, when stock is particularly susceptible to dramatic price movements. *See* Compl. ¶¶ 31, 123-124. Just over two years later, in May 2021, AbbVie, Inc. ("AbbVie") agreed to purchase Soliton for $22.60 per share in a deal worth $550 million; proving Mr. James' belief in the company

was well-founded. *See id.* ¶ 16; Oakes Decl., Ex. C. Unlike Soliton, the other microcap companies at issue in this case experienced steep declines in value post-IPO and are currently trading for the equivalent of $0.01 or $0.03 per share. *See* Compl., ¶¶ 15, 17-19.

During the two years Soliton was public, Mr. James was engaged by Soliton to tell its story to investors. *See id.* ¶ 55 (describing Consulting Agreement with Soliton for 87,500 shares in compensation). Mr. Ahmed Alomari, who regularly conducted stock promotion activities for companies, was engaged on behalf of Soliton to "introduce the company." *Id.* ¶¶ 56-57, 63. Mr. James told Mr. Alomari that he believed Soliton was "going to be a great deal" and it was. *Id.* ¶ 57. The promotional activities conducted by Mr. Alomari included educating investors on comparable competitors in the market (*id.* ¶ 59); historical information on market movement; (*id.* ¶ 83); projections on Soliton's value (*id.* ¶¶ 59, 62, 87-88); re-posted press releases, including about FDA approvals (*id.* ¶¶ 67, 88); and re-posted articles published by third-parties. *Id.* ¶¶ 83, 85. At times, Soliton executives provided materials directly to Mr. Alomari. *See id.* ¶ 82. Investors appeared to respond to Soliton's marketing efforts. *See id.* ¶ 61. There are no allegations that the disseminated promotions contained any false or misleading content about Soliton.

Mr. Alomari was compensated by Soliton with 25,000 shares of restricted Soliton stock. *See id.* ¶ 63. At the request of Mr. Alomari, Mr. James and Mr. Casey exchanged their respective unrestricted free trading Soliton shares for Mr. Alomari's restricted shares under separate Options Agreements. *See id.* ¶ 64. Later, Mr. James forgave Mr. Alomari's obligations under the Option Agreement at his request in exchange for Mr. Alomari

continuing to redistribute Soliton's press releases across his investor network. *See id.* ¶¶ 81-82.

Mr. James acquired and sold stock at various times from 2019 to 2021. *See id.* ¶ 55 (continued to "acquire and sell shares" post-IPO), 83 (stock sales August to October 2019), 86 (stock sales in July 2020). For example, Mr. James sold shares on May 29, 2019 after Soliton received a critical FDA approval that allowed Soliton to "transition from R&D to product development and commercialization" and "revenue generation;" an event some in the investor community doubted was attainable. Oakes Decl., Ex. D at 2; Oakes Decl., Ex. E; Compl., ¶ 67.

Notably, Mr. James also continued to finance Soliton through three secondary offerings on June 16, 2019, October 10, 2019, and June 26, 2020 at prices well-above Soliton's $5.00 IPO. *See id.* ¶ 68; Oakes Decl., Ex. J (purchasing shares at $14)*; id.*, Ex. K (purchasing shares at $12.88); *id.*, Ex. L (purchasing shares at $8.30). Soliton registered those shares for resale through the filing of Form S-1 registration statements. *See id.* ¶¶ 68-70; Oakes Decl., Ex. F at 14 (identifying Adrian James) ("July Form S-1"); *id.* Ex. G at 14 (identifying Adrian James) ("August Form S-1"); *id.*, Ex. H ("November Form S-1"). Mr. James was sent a draft of the August Form S-1 registration statement that identified him as a "selling shareholder." *See* Compl., ¶ 71; Oakes Decl., Ex. G at 14 ("This Selling Stockholder has indicated that Adrian James has voting control and investment discretion over the securities reported herein."). It also disclosed the existence of the 4.99% beneficial owner limitation and several notes purchase agreements. *See* Oakes Decl., Ex. G at 8, 13, 14, 19-20. Mr. James and the beneficial owner limitation was similarly disclosed in a July

1, 2019 Form S-1 filed with the SEC. *See* Oakes Decl., Ex. F at 8, 13, 14, 19-20. Soliton did not disclose Mr. James in the November Form S-1. *See* Compl. ¶ 78. While Mr. Casey is alleged to have completed a "selling shareholder questionnaire" for the November Form S-1, there are no allegations that Mr. James completed a similar "selling shareholder questionnaire" or drafted, reviewed, commented on or even saw the November Form S-1 before it was filed. *See id.* ¶¶ 72-78. Remeditex, Soliton's majority shareholder, invested in the same offerings as Mr. James and continued to hold over 50 percent of Soliton stock. *See* Oakes Decl., Ex. F at 13-14; *id.*, Ex. G at 13-14; *id.*, Ex. H at 14-16.

The SEC theorizes that certain defendants in this case sought to evade disclosure requirements because of a "series of recent private litigation in federal and state courts about another microcap stock, LuxeYard, Inc." ("LuxeYard"). *See id.* ¶ 4, 6 (identity of defendants "material" because they were promoters and investors in "a risky microcap company like LuxeYard"). Mr. James had no involvement in LuxeYard or the LuxeYard litigations and has never been named in any of the related filings. Mr. James put significant capital at risk in each investment round to help Soliton develop its breakthrough technology. Soliton was a company he believed in, which ultimately paid off for the benefit of all investors.

## **ARGUMENT**

A pleading is deficient and may be dismissed under Rule 12(b)(6) if a plaintiff fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a 12(b)(6) motion, the SEC must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570(2007). A claim is

facially plausible if the plaintiff pleads facts from which the court could "draw the reasonable inference that the defendant is liable for the misconduct alleged" and there is more than a "sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level[.]"). A complaint that tenders only "'naked assertion[s]' devoid of 'further factual enhancement'" will not suffice. *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557). Additionally, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should...be exposed at the point of minimum expenditure of time and money by the parties and the court." *Twombly*, 550 U.S. at 558 (internal quotation marks and citation omitted).

Given the SEC's allegations of fraud, the Complaint must also satisfy the heightened pleading standards imposed by Rule 9(b). Rule 9(b) requires that a complaint "state with particularity the circumstances constituting the fraud." Put simply, the complaint must specify the "who, what, when, where, and how" of the alleged fraud. *Sec. & Exch. Comm'n v. Verges*, 716 F. Supp. 3d 456, 465 (N.D. Tex. 2024). "The Fifth Circuit applies Rule 9(b) to fraud complaints with 'bite' and 'without apology.'" *Stephens v. Uranium Energy Corp.*, No. CV H-15-1862, 2016 WL 3855860, at *9 (S.D. Tex. July 15, 2016) (internal citation omitted).

## I. The SEC Has Failed to Plead Facts Sufficient to Draw a Reasonable Inference that Mr. James Violated Section 17(a)(2)

The SEC tries to hold Mr. James responsible for public statements made by Soliton, not Mr. James, in a November 2019 Form S-1. To survive a motion to dismiss under Section 17(a)(2), the SEC must allege that Mr. James actually obtained money "by means of" a material untrue statement. *See* 15 U.S.C. § 77q (prohibiting "obtain[ing] money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading"). A plaintiff must establish more than an attenuated "casual relationship" between material untrue statements and the acquisition of money. *See S.E.C. v. Syron*, 934 F. Supp. 2d 609, 637 (S.D.N.Y. 2013) (dismissing section 17(a)(2) claims where the SEC alleged only a tenuous connection between company offerings and defendants' profits). The Complaint here falls short.

The SEC's theory under 17(a)(2) rests on the assumption that Mr. James "caused" Soliton to omit information or file untrue statements. The Complaint purports to identify certain statements in Soliton's November Form S-1 intended to hide Mr. James' identity, ownership interest, and relationship with Soliton. *See* Compl. ¶¶ 78-80 (referring to Soliton's November Form S-1 as the "second Form S-1")). The SEC also claims that Soliton omitted certain information from its Forms S-1. *See* Compl. ¶¶ 79-80. However, a careful reading reveals no allegations that Mr. James had any role in filing the November Form S-1. While the Complaint offers particularized claims about Mr. Casey's completion

of a "selling shareholder questionnaire," it advances only a vague claim that Mr. James "used a nominee" to submit false information to Soliton about who controlled stock. *Compare* Compl. ¶¶ 73-76 *with* ¶¶ 78. The SEC does not contend that Mr. James completed a similar selling shareholder questionnaire or drafted, revised, reviewed, or even discussed the contents of the November Form S-1 with Soliton. When no longer improperly grouped with Mr. Casey, standing alone, there are insufficient allegations to support the inference that Mr. James caused Soliton to file untrue statements.

Even assuming Mr. James caused untrue statements, the Complaint offers no particularized allegations as to why Mr. James' identity, ownership, and relationship with Soliton was material. It was not. A fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic v. Levinson*, 485 U.S. 224, 231-32 (1988) (internal citation omitted). "To be actionable, a misrepresentation or omission of a fact must be objectively material." *Dawes v. Imperial Sugar Co.*, 975 F. Supp. 2d 666, 687 (S.D. Tex. 2013) (granting motion to dismiss). The SEC states in conclusory fashion that Mr. James' identity and relationship with Soliton, if disclosed, would have been material: "false and misleading statements and omissions alleged in this Complaint were material because a reasonable investor would have wanted to know the truth behind the misstatements and omissions." Compl. ¶ 6. They ignore that Mr. James' identity was disclosed to investors in Soliton's July 1, 2019 and August 6, 2019 Forms S-1 under which Mr. James acquired shares. *See* Oakes Decl., Ex. F at 13-14 (disclosing that Mr. James had "voting control and investment discretion"); *id.*, Ex. G at

13-14 (same).[2] Investors were aware of Mr. James involvement with Soliton and were free to investigate. Because Mr. James' identity and relationship with Soliton was already in the public domain, subsequent disclosure would not have altered the total mix of information available to investors and is immaterial as a matter of law. Additionally, Plaintiff's generalized group pleadings that disclosure of certain defendants' involvement in LuxeYard would have been material to investors are equally unavailing. *See* Compl., ¶ 6. Mr. James had no role in LuxeYard or the subsequent litigation that allegedly motivated the other defendants to hide their identities. *See* Compl. ¶¶ 4, 37-40.

Finally, any ostensible connection between Soliton's November Form S-1 and Mr. James' sale of stock is lacking. The specific trades identified in the Complaint were either *prior to* or seven months after the release of the November 2019 Form S-1. *See* Compl. ¶¶ 83 (sales in August, September, and October 2019); 86 (sales in July 2020). There is no well-pleaded allegation linking these trades to the November Form S-1. Nor are there particularized claims that Mr. James sold stock at artificially inflated prices based on untrue statements. Unlike the other companies identified in the Complaint, which the SEC alleges commenced trading between $4.50 and $6.50 per share and "currently trade[] for the equivalent of less than $0.01" or "$0.03 per share," Soliton never traded materially below its $5 IPO price and was sold approximately two years later to AbbVie, Inc. ("AbbVie"), one of the world's largest biotech companies, in an all-cash deal priced at $22.60 per share.

---

[2] The Fifth Circuit may take judicial notice of matters of public record and documents referenced in the SEC's complaint. *See Norris v. Hearst Tr.*, 500 F.3d 454, 461 n. 9 (5th Cir. 2007) ("[I]t is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record"); *Stephens*, No. CV H-15-1862, 2016 WL 3855860, at *8 (approving consideration of documents attached to a defendant's motion to dismiss that were "referred to in the plaintiff's complaint" and "central to the plaintiff's claim.") (internal quotation and citation omitted)

*See* Compl. ¶¶ 15-19; Oakes Decl., Ex. C; *id.*, Ex. I at 1-2, 21. This represented a price substantially *higher* than the price at which Mr. James sold his shares. *See* Oakes Decl., Ex. I at 5-6, 11 (Soliton stock traded between $9 and $15 from August to October 2019 and between $6 and $9 dollars in July 2020). Mr. James did not sell his Soliton stock at premium prices. For all the above reasons, the 17(a)(2) claim should be dismissed.

## II.    The SEC Has Failed to Plead Facts Sufficient to Support a Violation of Section 10(b) and Rules 10b-5(a) and 5(c) and Section 17(a)(1) and (3)

The SEC does not allege that Mr. James made false statements or omissions in violation of Rule 10b-5(b). Instead, the SEC asserts a claim for "scheme liability" in violation of Rules 10b-5(a) and (c) and 17(a)(1) and (a)(3), which prohibit employing any device, scheme or artifice to defraud and engagement in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of securities.[3] To adequately assert a claim for scheme liability, the SEC must allege specific independently deceptive or manipulative conduct by Mr. James in furtherance of a scheme to defraud with the requisite scienter. *See Verges*, 716 F. Supp. 3d at 466-67 (To demonstrate liability through such a scheme, Plaintiffs must prove "participation in an illegitimate, sham, or inherently deceptive transaction where the defendant's conduct or role has the purpose and effect of creating a false appearance."). Rule 9(b) requires the SEC identify specific facts that "would permit the conclusion that the alleged conduct was deceptive." *See Sec. & Exch. Comm'n v. Narayan*, No. 3:16-CV-

---

[3] Claims arising under § 10(b) and § 17(a) "are often analyzed as one" because of their similarities. *Verges*, 716 F. Supp. 3d at 467 (quoting *SEC v. Farmer*, 2015 WL 5838867, at *12 (S.D. Tex. Oct. 7, 2015)).

1417-M, 2017 WL 4652063, at *3 (N.D. Tex. Aug. 28, 2017) (quoting *In re Parmalat Sec. Litig.*, 414 F. Supp. 2d 428, 432 (S.D.N.Y. 2006)).  The SEC does not do so.

### A. The SEC Has Not Adequately Alleged Inherently Deceptive Conduct by Mr. James Distinct from the Alleged Misstatements or Omissions in Soliton's Filings

The SEC's scheme liability claim fails as a matter of law because it has not alleged any independent wrongful conduct beyond alleged misstatements or omissions.  *See Sec. & Exch. Comm'n v. Mueller*, No. SA-21-CV-00785-XR, 2024 WL 400897, at *8 (W.D. Tex. Jan. 11, 2024) ("As the Second Circuit aptly summarized, 'misstatements and omissions can form part of a scheme liability claim, but an actionable scheme liability claim also requires something beyond misstatements and omissions, such as dissemination.'") (citing *Sec. & Exch. Comm'n v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022)); *Sec. & Exch. Comm'n v. Jaitley*, No. 1:21-CV-832-DAE, 2023 WL 9105678, at *7 (W.D. Tex. Nov. 13, 2023) ("scheme liability 'hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement'") (citing *Farmer*, 2015 WL 5838867, at *14 ); *SEC v. Killion*, No. H-16-621, 2017 WL 7052310, at *8-9- (S.D. Tex. Mar. 24, 2017) (same).  "[C]ourts must scrutinize [a scheme liability claim] to ensure that misrepresentation or omission claims do not proceed under the scheme liability rubric.'" *Farmer*, 2015 WL 5838867, at *14 (internal citation omitted).

The thrust of the SEC's alleged scheme involves the acquisition of shares in certain companies' pre-initial public offering at steep discounts, participation in taking the companies public and/or marketing the companies' stock, and selling stock at inflated values *without making required disclosures about their stock ownership and relationships*

*with the companies.* *See* Compl. ¶ 1. The SEC dubbed the alleged plan a "scheme to evade" disclosures or a "scheme to conceal" information from investors. Compl. ¶¶ 3, 24. Courts in the Fifth Circuit hold that a scheme to evade or conceal information from investors is simply an omission and should not be considered a distinct "manipulative device." *See Narayan*, 2017 WL 4652063, at *10 (dismissing scheme liability claims where the core misconduct was concealing omissions and misrepresentations to investors).

*Narayan* is instructive. In *Narayan*, the SEC attempted to paint a scheme involving a secret agreement to keep conduct concealed from investors. The Court found that "the fact that it was secret makes it closer to liability for an omission, rather than an independent deceptive act." *Id.* Additionally, "if the scheme is to keep something concealed from investors . . . it is unclear how the SEC can claim a 'fraudulent scheme' that is not the equivalent of pleading fraud by omission." *Id.* Accordingly, "where the core misconduct is clearly [defendant]'s misrepresentations to [the company]'s investors, 'it [is] improper to impose primary liability . . . by designating the alleged fraud as a 'manipulative device,' rather than a 'misstatement.'" *Id.* (internal citation omitted). Like in *Narayan*, Mr. James' purported role in the alleged scheme was to conceal information from investors: in this case, his identity, personal involvement and ownership interest in Soliton, interactions with a stock promoter, and his sale of Soliton stock from investors, (*see* Compl. ¶¶ 1, 3, 5), all of which took place in secret: "while out of the public eye." *Id.* ¶ 2. Where the core alleged misconduct is purported misrepresentations or omissions, and it is improper to redesignate

the alleged fraud as a manipulative or deceptive act.[4]  The first and third claims for relief

can be dismissed on this ground alone.

>    B. <u>The SEC Has Not Sufficiently Alleged Participation by Mr. James in Other
>    Inherently Deceptive Conduct Where His Role Had the Primary Purpose and
>    Effect of Creating a False Appearance</u>

The SEC has not alleged conduct on the part of Mr. James that is by nature deceptive

or had the principal purpose and effect of creating a false appearance for investors.  *See*

*Verges*, 716 F. Supp. 3d at 466-67.  When alleging a scheme involving deceptive or

manipulative acts, the SEC must state "what deceptive or manipulative acts were

performed, which defendants performed them, when the acts were performed, and what

effect the scheme had on investors in the securities at issue."  *SEC v. Lee*, 720 F. Supp. 2d

305, 338 (S.D.N.Y. 2010) (emphasis added); *In re Enron Corp. Sec., Derivative & ERISA*

*Litig.*, No. CIV.A. H-01-3624, 2006 WL 6892915, at *3 (S.D. Tex. Dec. 4, 2006) (same).

There is nothing "inherently deceptive" about lawfully engaging an outside firm to issue

truthful communications.

The SEC insinuates that Soliton's retention of a stock promoter, who disseminated

truthful communications and with whom Mr. James interacted, and Mr. James' sale of

Soliton stock over the two years Soliton was public qualify as inherently deceptive conduct.

*See* Compl. ¶¶ 56-67, 81-88.  However, participation in legitimate marketing promotions

---

[4] Soliton was well-aware of Mr. James' role and ownership in the company.  Soliton, not Mr. James, had the ultimate authority over its public filings and any statements or omissions therein, including its content and whether and how to communicate those statements to investors.  *See Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142–43 (2011).  The SEC cannot evade *Janus* by asserting scheme liability claims against Mr. James.  Nor should Rule 10b-5(a) and (c) be used as a back door into liability for those, like Mr. James, who allegedly helped others, in this case Soliton, make purportedly false statements or omissions.

intended to educate the public or raise awareness about a stock or to encourage investment in the same period one sells stock is not inherently deceptive conduct. Courts "have uniformly rejected the premise that lawfully engaging a promotional firm, without any misleading information in any of the articles, is 'manipulation' of a stock price in violation of securities laws." *In re Genius Brands Int'l, Inc. Sec. Litig.*, No. CV 20-7457 DSF (RAOX), 2021 WL 12327975, at *7 (C.D. Cal. Aug. 30, 2021); *see also Stephens.*, 2016 WL 3855860, at *14 ("A company may advertise or promote its stock without violating the securities laws."); *S.E.C. v. Daifotis*, No. C 11-00137 WHA, 2011 WL 2183314, at *9 (N.D. Cal. June 6, 2011) (recognizing in dismissing a scheme liability claim that the "marketing of an ultra-short bond fund was not inherently deceptive conduct."); *U .S. v. Hall*, 48 F. Supp. 2d 386, 387 (S.D.N.Y. 1999) (finding that a company may hire legitimate stock promoters to educate the public).[5] The SEC admits that "some microcap companies pay persons or entities to recommend or 'tout' stock . . . in unsolicited electronic communications, such as emails, texts, social media posts or internet chatrooms." Compl. ¶ 31.

Mr. Ahmed Alomari was hired as a stock promoter by Soliton shortly after its Initial Public Offering ("IPO") to "introduce the company" to investors. *Id.* ¶¶ 57-58, 63. He did so by restating publicly available information about Soliton's business and opining that

---

[5] The SEC seems to suggests that Mr. James had some duty to disclose or ensure Mr. Alomari disclosed his compensation. *See* Compl. ¶ 84. This is unsupported in the law. The onus is squarely on the promoter to disclose promotional payments. Under § 17(b) of the Securities Act, the duty to disclose promotional payments lies with the parties that receive the payments for promotional activities. 15 U.S.C. § 77q(b); *Stephens*, 2016 WL 3855860, at *14 (holding that the burden to disclose is on the party that publishes and "absent an affirmative duty to disclose the advertisements, defendants' general knowledge of the advertising campaign does not support an inference that they acted with scienter.").

Soliton's stock was a good investment. For example, the SEC cites various promotions where Mr. Alomari informed investors about competitors, posted positive articles about Soliton published by third-parties, relayed changes in stock price, and conveyed personal expectations about Soliton's value. *Id.* ¶¶ 59, 62, 67, 82, 83, 85. For example, Mr. Alomari reposted an article on May 29, 2019 informing the public about Soliton's receipt of FDA approval, which was critical to Soliton's ability to generate revenues. *Id.* ¶ 67; Oakes Decl., Ex. D. Similarly, on July 6, 2020, Mr. Alomari reposted an article from Seeking Alpha to "get some eyeballs on it." *Id.* ¶ 85. When viewed holistically, the promotions are nothing more than a campaign to educate investors about a newly public company. There is simply no inference that Soliton, and Mr. James by extension, did anything other than exercise its First Amendment right to use third party promotors.

Notably absent here are any cognizable claims that the promotions were factually untrue or materially misleading in any respect. This case is a far cry from *SEC v. Fiore*, in which the court found deceptive conduct where there was rampant market manipulation, including marking the close, matched and wash trades, and painting the tape, combined with a misleading promotional campaign designed to falsely reflect the level of market interest in the stock. 416 F. Supp. 3d 306 (S.D.N.Y. 2019). Similarly, in *Farmer*, the court found deceptive conduct where the advertisements themselves were false or misleading. 2015 WL 5838867. In contrast, Mr. James believed, and Mr. Alomari conveyed to investors, that Soliton was "going to be a great deal" and it was. Compl. ¶ 57. As discussed above, Soliton was sold only two years after its initial IPO to AbbVie for $22.60 per share.

For this reason, there are also no particularized allegations that Soliton's stock was artificially inflated. The SEC creates the misleading impression that Soliton's stock price was driven primarily by the alleged hype from the above promotions. Beyond a single conclusory contention that the Defendants had the "common objective of selling shares in the open market at inflated values," the Complaint is devoid of claims that the promotions artificially inflated or effected the stock price. Compl. ¶ 2. There are no allegations that there was any immediate uptick in Soliton's stock after each promotion or any correlation between Soliton's stock movement and the dissemination of the promotions. While Soliton's stock price fluctuated, it generally traded well above its $5 IPO price, ultimately selling at $22.60 per share, well above where Mr. James sold the majority of his stock. *See Stephens*, 2016 WL 3855860, at *1-2 (dismissing fraud claims that insinuated a scheme to pump the stock price without any corresponding sale, or 'dump', at inflated prices).

Finally, the allegations purporting to connect the promotions to Mr. James' stock sales are tenuous at best. For example, paragraph 67 contends that Mr. James sold shares after Soliton received a critical FDA approval in May 2019. Public records reflect some investors doubted Soliton's ability to obtain this approval, so its receipt was well-publicized and naturally led to an increase in stock price that Mr. James chose to capitalize on. *See* Oakes Decl., Ex. E; *id.* Ex. I at 3. Paragraph 83 discusses two promotions by Mr. Alomari in mid-August 2019 that the SEC attempts to tie to three months of subsequent trading by Mr. James. Similarly, paragraphs 85-86 try to link 12 days of trading to a single news article re-posted by Mr. Alomari despite significant fluctuations in the stock across that period. *See* Oakes Decl., Ex. I at 11. Alleging that Mr. James generally sold stock

over long periods of time while the company engaged in lawful stock promotions is insufficient to infer deceptive conduct or a fraudulent scheme.[6]

## C. The SEC Has Not Adequately Pled Scienter

The SEC also fails to adequately plead scienter—a required element for the SEC's claims under Rule 10b-5 (the third claim for relief) and § 17(a)(1) (part of the first claim for relief).[7] "To plead scienter adequately in the securities law context, 'Rule 9(b) requires the SEC set forth specific facts in the complaint that support an inference of fraud.'" *Narayan*, 2017 WL 4652063 at *11 (citing *SEC v. Blackburn*, 156 F. Supp. 3d 778, 790 (E.D. La. 2015)). The Fifth Circuit considers two means of satisfying the scienter requirement at the pleading stage: either allege facts (1) showing a "defendant's motive to commit securities fraud," or (2) "constitut[ing] strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* at *12. "[C]ircumstantial evidence may be sufficient to establish scienter, but the evidence must be correspondingly greater." *Verges*, 716 F.Supp.3d at 471; *see also Narayan*, 2017 WL 4652063 at *12.

---

[6] To the extent the SEC alleges that the dissemination of misleading or false statements is a part of the alleged scheme, those statements must be material. "While claims based on 'dissemination of false or misleading statements with intent to defraud can fall within the scope of subsections (a) and (c) of Rule 10b–5," *Lorenzo v. Sec. & Exch. Comm'n*, 139 S. Ct. 1094, 1100 (2019), it follows that a complaint must still adequately plead the predicate misconduct—making a false statement or omission of material fact—to be actionable." *Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, No. 19 CIV. 7536 (NRB), 2021 WL 1199035, at *32 (S.D.N.Y. Mar. 30, 2021) (holding that scheme liability failed where plaintiffs did not adequately allege that the misstatements were material). As discussed above, the purported misstatements in Soliton's November 2019 Form S-1 were not material.

[7] Claims under Rule 10b-5 and Section 17(a)(1) require a showing of scienter and claims under Sections 17(a)(2) and (3) require a showing of negligence. *See Aaron v. SEC*, 446 U.S. 680,701-02 (1980); *Sec. & Exch. Comm'n v. Jankovic*, No. CV15CIV1248KPF, 2017 WL 1067788, at *8 (S.D.N.Y. Mar. 21, 2017) ("Section 17 (a)(2) and (3) only require proof of negligence"). There are no allegations that Mr. James did not take reasonable care in relation to Soliton's engagement of Mr. Ahmed or Soliton's November Form S-1, which the SEC did not allege Mr. James even saw before it was filed. *See S.E.C. v. Berry*, 580 F. Supp. 2d 911, 925 (N.D. Cal. 2008) (dismissing claims where the allegations asserted only that the defendant "reviewed" purportedly untrue statements).

Mr. James has no apparent motive for participation in the SEC's alleged scheme, as he did not have and is not alleged that he had any involvement with LuxeYard or the LuxeYard litigation. The Complaint states: "[t]he purpose for evasion was to avoid disclosing the Defendants' identities as significant shareholders of, and their material relationships to, these companies" because "Casey, Friedlander, and Wheat had all been named defendants in a series of recent private litigation in federal and state courts about another microcap stock, LuxeYard, Inc." Compl. ¶ 4. In an attempt to manufacture a motivation, the SEC states that "of particular interest to investors would have been the fact that Defendants – whether individually, **or in the case of Friedlander and James with Casey**, as a group – were public company promoters, selling shareholders, and/or 5%+ beneficial owners **of a risky microcap company like LuxeYard**." Compl. ¶ 6 (emphasis added). This is the best the SEC can muster. While the SEC tries to sneak Mr. James into the alleged scheme by including his name in the same sentence as the other defendants about LuxeYard, it is clear that Mr. James had no role in LuxeYard and the SEC has offered no other motivation for his participation in the alleged scheme.

Scienter cannot be inferred simply from Mr. James' sale of stock, efforts to enhance the value of Soliton's security through truthful stock promotions, or assistance in Soliton's public offering. In the Fifth Circuit, it is insufficient to allege a general profit motive. *See Verges*, 716 F.Supp.3d at 471-72 ("The SEC does not allege a general profit motive, which is insufficient in the Fifth Circuit to establish scienter."); *Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir. 1994) (holding that alleged motive to successfully bring to fruition offerings and enhance the value of the securities was insufficient to establish inference of fraud);

*Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994) (holding that motive to inflate stock price and value of defendants' investments was insufficient to establish scienter under Rule 9(b)). As discussed above, the claims show that Mr. James worked in good faith to successfully bring Soliton to an IPO and to enhance the value of its stock through legal promotional activities. The SEC also ignores that, Mr. James, at enormous financial risk, provided at least three rounds of much needed additional financing to Soliton at rates well-above the $5 IPO in exchange for stock, which created enormous opportunity for Soliton's shareholders and negates any purported intent to defraud investors. ¶ 55 (Mr. James "acquire[d]" shares after the IPO); Oakes Decl., Ex. J; *id.*, Ex. K; *id.*, Ex. L; *see Carlton v. Cannon*, 184 F.Supp.3d 428, 481 (S.D. Tex. 2016) (finding that increasing stock holdings during the relevant time period negates scienter).

For all of the above reasons, the first and third claims for relief should be dismissed.

## III.     The SEC's Section 13(d) Claim Should Be Dismissed

The remaining claim against Mr. James, which is brought under Section 13(d) of the Exchange Act, should also be dismissed. The SEC has alleged that Mr. James acted as a "group" with Mr. Casey because they discussed their investment in Soliton, worked together to take Soliton public, invested equal amounts of money in Soliton, entered into similar consulting agreements, and engaged in parallel private sales of securities to third parties. *See* Compl. ¶¶ 47-55. This is not the type of relationship that triggers "group" disclosures. Section 13(d) requires any person or group of persons that owns or acquires beneficial ownership of more than five percent of a class of stock to file an ownership report with the SEC on Schedule 13D. Any evaluation of a Section 13(d) claim should

begin with the purpose of the statute. The purpose of Section 13(d) "is to alert the marketplace to every large, rapid aggregation or accumulation of securities . . . which *might represent a potential shift in corporate control.*" *Nano Dimension Ltd. v. Murchinson Ltd.*, 681 F. Supp. 3d 168, 180 (S.D.N.Y. 2023) (*citing GAF Corp. v. Milstein*, 453 F.2d 709, 717 (2d Cir. 1971)) (emphasis added).

As the Complaint acknowledges, Mr. James' investment in Soliton was purposefully structured to include a legally permissible "blocker" to ensure that his investment remained below the five percent threshold. Compl. ¶ 49. Further, Mr. James and Mr. Casey do not constitute a "group" under Section 13(d). A section 13(d) "group" is formed when two or more investors "agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer." 17 C.F.R. § 240.13d-5(b)(l); 15 U.S.C. §78m(d)(3). The group definition exists to prevent a group of investors from secretly acquiring control by having each investor individually acquire less than the five percent threshold. *See Rubenstein v. International Value Advisers, LLC*, 959 F.3d 541, 547 (2d Cir. 2020). The fact that Mr. James and Mr. Casey were both compensated with Soliton stock, and both sold stock following certain events, such as Soliton's receipt of FDA approval or the registration of their shares, does not make them a "group" for purposes of Section 13(d). Similarly, assertions that Mr. James and Mr. Casey occasionally acted in parallel cannot establish a "group" under the law; parallel conduct could just as well be independent action. *See, e.g.*, *Augenbaum v. Anson Investments Master Fund LP*, No. 22-cv-00249 (VM), 2023 WL 2711087, at *6-8 (S.D.N.Y. Mar. 30, 2023) (no group where investors entering into a securities purchase agreement together, engaged in parallel

investments, and used one investor as an agent); *Lowinger v. Morgan Stanley & Co. LLC*, 43 F. Supp. 3d 369, 376-77 (S.D.N.Y. 2014) (no group because "[t]he fact that two groups benefited" or "are similarly situated in goals or interests does not plead the existence of a Section 13(d) group"); *see also Twombly*, 550 U.S. at 557-58 ("Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.").

Additionally, at all times while Soliton was a public company, it had a majority shareholder, Remeditex, and was effectively immune from a corporate takeover. When Soliton went public in February 2019, the company disclosed that Remeditex would own between 54.4% and 60.4% of Soliton's outstanding common stock, depending on the number of shares purchased in the offering, and would "continue to have the ability to exert significant influence over all corporate activities." Oakes Decl., Ex. A at 28; *id.*, Ex. B at 27. Remeditex had full control of Soliton throughout the relevant time period. *Id.*, Ex. A at 27-28; *id.*, Ex. B at 27-28. There is no scenario under which Mr. James and Mr. Casey could have pooled their shares to control Soliton. Here, the SEC has inappropriately weaponized an anti-takeover statute in a manner contrary to its intended purpose. Accordingly, the fourth claim for relief should be dismissed.[8]

---

[8] The remaining claim for unjust enrichment against the Relief Defendants is dependent on the three primary claims and therefore should be dismissed as well.

## CONCLUSION

For the foregoing reasons, Defendant Mr. James and Relief Defendants request the

Court grant their Motion and enter an order dismissing the Complaint and granting them

such other and further relief as the Court deems just and proper.

Dated: February 21, 2025

**NORTON ROSE FULBRIGHT US LLP**

/s/ *Mark Oakes*
Mark Oakes
98 San Jacinto Blvd. Suite 1100
Austin, Texas 78701
Tel: 512-536-5221
Fax: 512-536-4598
mark.oakes@nortonrosefulbright.com

Katey L. Fardelmann (*admitted pro hac vice*)
Alexander Newton (*admitted pro hac vice*)
1301 Avenue of the Americas
New York, New York 10019
Tel: 212-318-3000
Fax: 212-318-3400
katey.fardelmann@nortonrosefulbright.com
alexander.newton@nortonrosefulbright.com

*Counsel for Defendant Adrian James and
Relief Defendants ALS Investments, LLC,
Highbridge Consultants, LLC, and Adrian
James as the Trustee of the ASJ Living Trust*

## CERTIFICATE OF SERVICE

I hereby certify that on February 21, 2025, a true and correct copy of the foregoing was served on all counsel of record in accordance with the Federal Rules of Civil Procedure via the Court's ECF system.

/s/ *Mark Oakes*
Mark Oakes

## CERTIFICATE OF CONFERENCE

I hereby certify that on February 18, 2025, co-counsel Katey L. Fardelmann met and conferred by video conference with counsel for Plaintiff Securities and Exchange Commission regarding Defendant Adrian James's and Relief Defendants motion to dismiss. However, the parties were unable to resolve the issues and accordingly, they remain disputed and opposed.

/s/ *Mark Oakes*
Mark Oakes